[No. 37890-2-I.    Division One.    January 21, 1997.]

DONALD WAYNE CALLECOD, *Appellant*, v.
WASHINGTON STATE PATROL, ET AL., *Respondents*.

*Joseph E. Fischnaller* and *Reaugh Fischnaller & Oettinger, P.S.,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Eric A. Mentzer, Assistant,* for respondents.

KENNEDY, A.C.J. — Several months after he slipped and fell while working as a trooper for the Washington State Patrol (WSP), Donald Callecod applied for disability retirement benefits. His request was denied and the denial was affirmed, first by the Disability Benefits Review Board and then by WSP Chief Annette Sandberg, who adopted the Board's decision. Callecod appealed to the Snohomish County Superior Court, which affirmed the denial of benefits. Callecod now appeals to this court, contending that the decision to deny benefits was based on a misapplication and misinterpretation of the law, that the decision is not supported by substantial evidence when viewed in the light of the record as a whole, and that the decision is arbitrary and capricious. Because Callecod has failed to demonstrate the invalidity of the agency action, we affirm.

## FACTS

On a snowy morning in November 1993, while flagging traffic through an accident scene, WSP Trooper Donald Callecod slipped, fell, and slid partially under his patrol car. He immediately resumed his work. The following morning Callecod visited his family physician, Dr. Hanson, who determined that Callecod had fractured his right elbow and wrist, bruised his hip area, and aggravated a previous shoulder injury.

In the days following the accident, Callecod began having headaches and ringing in his ears. He took seven days off from work, but his symptoms persisted. Over the next several months, Callecod began to experience difficulty sleeping, nightmares, inability to make routine decisions and perform routine tasks without extreme effort, trouble concentrating, strong impulses to hurt other people, panic attacks, suicidal impulses, weight loss, and feelings of rage, worthlessness, and despair. Callecod continued to work without reporting his symptoms to the WSP. None of his co-workers who later testified at the Board hearing noticed that Callecod was having any emotional problems, and his supervisor deemed his work to be satisfactory.

Nearly five months after the accident, feeling that he had "hit the wall," Callecod again went to see Dr. Hanson. After performing a physical and psychological evaluation, Dr. Hanson diagnosed Callecod with major depression with anxiety and suicidal ideation, and recommended that Callecod take some time off from work. Dr. Hanson prescribed anti-depressants for Callecod, and referred him to a psychologist, Dr. Tracy. Callecod did not return to work and requested temporary disability leave from the WSP under RCW 43.43.040(1)(a).[1] The WSP denied his request for temporary disability benefits and ordered Callecod placed on leave-without-pay status.

Callecod then applied for permanent job-related disability leave under RCW 43.43.040(1); (2).[2] After reviewing Callecod's medical records from his treating physicians and the report of Dr. Berryman Edwards, a physician

[1]RCW 43.43.040(1)(a) provides, in pertinent part: "Any officer disabled while performing line duty . . . shall be placed on disability leave for a period not to exceed six months[.]"

[2]RCW 43.43.040(1); (2) provide, in pertinent part: "(1) The chief of the Washington state patrol shall relieve from active duty . . . patrol officers who, while in the performance of their official duties, or while on standby or available for duty, have been . . . incapacitated to such an extent as to be mentally or physically incapable of active service . . . . (2) Officers on disability status shall receive one-half of their compensation at the existing wage, during the time the disability continues in effect[.]"

employed by the WSP to examine Callecod, the WSP again denied Callecod's request for benefits.

Callecod requested review of the denial of benefits by the WSP Disability Retirement Board (Board). The Board heard the testimony of Callecod's two treating physicians, Dr. Hanson[3] and Dr. Tracy, and of three other physicians who examined Callecod, all of whom diagnosed Callecod with depression. Four of these five doctors concluded that Callecod was not able to perform the regular duties of his position as a patrol officer, including clerical duties (the fifth physician was not asked to draw a conclusion regarding fitness for duty). Dr. Hanson opined that Callecod's prognosis was for a full recovery in as little as 30 to 60 days. The consensus of these doctors was that Callecod's depression was connected with the injuries received in the slip and fall accident.

The WSP called only Dr. Edwards as an expert witness. Dr. Edwards, who admitted having a bias against workers applying for benefits, and who admitted having spent considerably less time with Callecod than any of the treating or other examining physicians, testified that Callecod's symptoms were inconsistent with a diagnosis of depression and could have resulted in part from the combination of anti-depressant medications which had been prescribed by Dr. Hanson. Dr. Edwards testified that a psychiatrist had recommended a change of medications but that this had never been accomplished. Dr. Edwards diagnosed Callecod with a personality disorder, instead of depression, but was unable to diagnose any specific personality disorder, due, he said, to the short period of time he had spent with Trooper Callecod. Dr. Edwards testified that he believed that Callecod had the personality disorder before he went to work for the WSP, and that Callecod's symptoms were not caused by his workplace environment or by his accident, but by a combination of the personality disorder and Callecod's dislike for his work as a trooper. Dr.

---

[3]Although Dr. Hanson did not personally testify, he submitted a detailed written report.

Edwards declined to express an opinion with respect to Callecod's fitness for duty, but testified, in response to a question incorporating a summary of Callecod's emotional symptoms, that he would recommend that the WSP return a trooper to duty who was having fantasies of committing physical violence against traffic violators, so long as the fantasies were not the product of a mental illness and so long as Dr. Edwards believed there was little likelihood that the fantasies would be carried out. Dr. Edwards stated that fantasies are common.

Based on Dr. Edwards' testimony and that of Callecod's supervisor and fellow troopers, who testified that Callecod had seemed fine to them during the weeks before he went on leave, the Board found Callecod able to perform active service, but recommended that he not be returned to line duty while on medications and until pronounced fit for line duty by the department psychologist. The Board recommended denial of disability status to WSP Chief Annette Sandberg, who adopted the Board's findings and denied disability status for Callecod.

Callecod sought review of the decision by the Snohomish County Superior Court. The court held that the denial of benefits was proper because Callecod did not demonstrate any errors of law and because the Board's findings were supported by substantial evidence in the record. The court granted Callecod's motion for a stay, ordering that he be allowed to remain on leave-without-pay status pending a final appellate decision.

This appeal followed.

## DISCUSSION

When a trooper of the Washington State Patrol is injured while on the job, RCW 43.43 provides that the trooper may receive temporary disability benefits of up to six months of full pay, benefits and insurance if the trooper was injured or incapacitated while performing "line duty." RCW 43.43.040(1)(a). Thereafter, or if the

trooper does not qualify for temporary benefits, he or she may receive disability retirement benefits of one-half of regular pay if disabled while "in the performance of their official duties, or while on standby or available for duty." RCW 43.43.040(1), (2). Whether a disabled trooper receives (full-pay) temporary benefits for six months from the time of the injury and then (half-pay) regular retirement disability benefits thereafter, or merely receives (half-pay) retirement disability from the outset, depends on whether the trooper suffered the injury while on "line duty" or during "active service." "Active service" is simply the performance of duties of whatever type, performed pursuant to a superior's orders. WAC 446-40-020(1) . Active service consists of "line duty" and "other duty." "Line duty" is:

> [A]ctive service which encompasses the traffic law enforcement duties and/or other law enforcement duties and/or other law enforcement responsibilities of the Washington state patrol. These duties encompass all law enforcement activities, accident and criminal investigations, or actions requiring physical exertion or exposure to hazardous elements.

WAC 446-40-020(2). "Other duty" is:

> [A]ctive service which encompasses activities consistent with the responsibilities of the Washington state patrol, but which do not foreseeably require more physical exertion than that normally required for the performance of clerical tasks.

WAC 446-40-020(3). Thus, whereas active service can include clerical tasks, line duty cannot.

The Board and the Chief were required in this case first to determine whether Trooper Callecod was injured or incapacitated to such an extent that he was incapable of active service; if so, the Board and the Chief would be required to determine next whether the trooper became injured or incapacitated while performing official duties and thus was entitled to disability benefits under RCW 43.43.040. Because the Board and the Chief answered the first question, that of inability to perform active service,

in the negative, they never reached the question of whether Trooper Callecod was injured or incapacitated while performing official duties. They simply concluded that he was not, in fact, unable to perform active service although he was temporarily unable to perform line duty.

Judicial review of administrative and agency orders is governed by RCW 34.05.570(3). *Hensel v. Department of Fisheries*, 82 Wn. App. 521, 525, 919 P.2d 102 (1996). Under RCW 34.05.570(3), this court may reverse an administrative decision only if: (1) the administrative decision was based on an error of law; (2) the decision was not based on substantial evidence when viewed in the light of the record as a whole; or (3) the decision was arbitrary or capricious. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 407, 914 P.2d 750 (1996) (citing *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993)). The appellate court applies these standards directly to the record before the administrative agency. *Tapper*, 122 Wn.2d at 402-03.

Callecod contends that the Chief erred in applying or interpreting RCW 43.43.040, in that the meaning of the phrase "injured or incapacitated to such an extent as to be mentally or physically incapable of active service" found in RCW 43.43.040(1) must be governed by Washington case law interpreting other statutes treating disability retirement pay for police officers and firefighters.

For example, Callecod points to *Clark v. Board of Police Pension Fund Comm'rs*, 189 Wash. 555, 66 P.2d 307 (1937). In *Clark*, our Supreme Court examined REM. REV. STAT. § 9583, which provided for disability retirement at half pay for officers who had become "incapacitated for service," and which further provided for recall to "active service" of those officers whose disabilities had ceased. The court held that "[t]he disability . . . has ceased if the policeman is reasonably able to perform the ordinary duties of a police officer." *Clark*, 189 Wash. at 559. The dispositive issue in *Clark* was whether the officer, who had received disability retirement subject to periodic re-

examination and recall to active service upon cessation of the disability after he was injured while serving as a motorcycle patrol officer, was able to perform the ordinary duties of a police officer, although he could no longer ride a motorcycle. The reviewing board found that his disability had ceased because the police department had switched from motorcycles to patrol cars and it was undisputed that the officer could drive a patrol car. The Supreme Court affirmed the board's determination, stating that fitness for duty means "the ability to discharge, with average efficiency, the duty of the grade to which he belongs." *Clark*, 189 Wash. at 563. The court was satisfied from the evidence in the record that the officer could drive a patrol car with average efficiency, that being the grade to which he belonged after the police department switched from motorcycles to prowl cars. *Id.*

For another example, Callecod points to *Morrison v. Department of Retirement Sys.*, 67 Wn. App. 419, 835 P.2d 1044 (1992). In *Morrison*, this court examined RCW 41.26, the LEOFF Retirement System Act, which provides for disability retirement for those police officers and firefighters "unable to continue service." RCW 41.26.120. Because the LEOFF Retirement System Act did not define "unable to continue service," the court looked to *Clark* and to an agency regulation adopting the "average efficiency" aspect of *Clark*, specifically WAC 415-105-060(2). That regulation provides that applicants for disability retirement must prove that they are " 'unable to discharge with average efficiency the duty of the position held at time of discontinuance of service[.]' " *Morrison*, 67 Wn. App. at 424. In *Morrison*, the officer had an arthritic condition that prevented him from performing strenuous activity, but did not prevent him from doing desk work. The King County Disability Board granted the officer a disability retirement but the assistant director for the department reversed the Board. An administrative law judge recommended reinstatement of the disability retirement because the officer's duties required more than desk work, but the Department of Retirement Systems rejected the proposed

order. The Superior Court reversed the Department, and this court affirmed that ruling, in that the LEOFF system requires that an officer be able to perform the duties of the position held (albeit not every conceivable duty) and the undisputed evidence showed that although the officer primarily held a desk position, he was required to be able, upon the need arising, to perform more strenuous tasks, which indisputably he could not perform. *Morrison*, 67 Wn. App. at 424-26.

Unfortunately for Callecod, *Clark* and *Morrison* do not govern the meaning of the phrase "incapacitated to such an extent as to be mentally or physically incapable of active service" found in RCW 43.43.040(1). The Washington State Patrol's disability requirements are governed by an exclusive statute and regulations that are not tied by analogy or otherwise to the LEOFF system or to any earlier Washington police disability retirement statute. At the Senate Committee on State Government hearing held on April 14, 1981 (regarding an amendment to the WSP disability statute), then-Chief R. W. Landon testified that the WSP would continue, under the amendment, to make every effort to find nonline duty assignments for injured officers so that the incidence of special disability status would be kept to a minimum. *Hearing on E.H.B. 620 Before the Senate Comm. on State Gov't*, 47th Leg., Reg. Sess. (Apr. 14, 1981, tape recording).[4] Consistent with Chief Landon's testimony, the WSP's disability regulations provide that the Disability Review Board "shall recommend specific job assignments within the department which the member is mentally and physically capable of performing in his/her present condition." WAC 446-40-070(6). In turn, this regulation, together with those defining line duty, active duty and other duty, which we have quoted above, is consistent with the language of RCW 43.43.040(1) providing for disability retirement for those troopers who are incapacitated from

---

[4]The tape may be found at the Washington State Archives.

performing active service, not for those troopers who are merely incapacitated from performing line duty.

■ Thus, a police officer or firefighter governed by the LEOFF retirement system may receive disability retirement when he or she is incapable of performing strenuous activity although still capable of performing desk work, but a trooper of the Washington State Patrol may be required to assume desk duty in lieu of taking disability retirement when capable of performing desk duty but incapable of performing line duty.[5] Accordingly, we reject Callecod's contention that the Board and the Chief misinterpreted or misapplied the law governing WSP disability retirements by failing to grant Callecod a disability retirement upon finding that he was currently unfit for line duty. So long as the decision that Callecod was fit for active service, though not for line duty, is supported by substantial evidence, the decision properly applies the law governing WSP disability retirements.

■ But Callecod contends that the administrative decision is not supported by substantial evidence. In order to be upheld, the decision must be supported by a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.[6] RCW 34.05.570(3)(e); *Olmstead v. Department of Health*, 61 Wn. App. 888, 893,

---

[5]As was recognized by the *Clark* court, police disability requirements are statute-driven. *See Clark*, 189 Wash. at 560-61 (quoting at length from *Simmons v. Policemen's Pension Comm'n*, 111 N.J. 134, 166 A. 925, 926 (1933), which, in turn, recognized that the New Jersey statute there at issue could have but did not require police officers whose injuries rendered them permanently unfit for everyday duty to perform desk duties in lieu of receiving disability retirement). *See also Clark*, 189 Wash. at 561-62 (quoting, again at length, from *People ex rel. Metcalf v. McAdoo*, 184 N.Y. 268, 77 N.E. 17, 18 (1906) in which the court, interpreting the New York statute there at issue, distinguished between inability to perform full duty and inability to perform less strenuous police duties. The *McAdoo* court disapproved a practice of granting disability retirement to officers who could not perform full duty, in that the statute was not so structured.).

[6]The effective date portion of the Administrative Procedure Act, RCW 34.05.902, provides that the standard of review for agency proceedings that began prior to July 1, 1989, is "clearly erroneous," as outlined in the former (1967 version of) RCW 34.04.130, and that agency proceedings, such as in this case, begun on or after that date are governed by the "substantial evidence" test under RCW 34.05.570(3)(e). *See, e.g., Dana's Housekeeping, Inc. v. Department of*

812 P.2d 527 (1991) (citing *Green Thumb, Inc. v. Tiegs*, 45 Wn. App. 672, 676, 726 P.2d 1024 (1986)).

Although Callecod presented a huge amount of testimony in support of his claim that depression caused him to be unable to perform any of the duties within the definition of "active service" including clerical duties, the Board and the Chief had before them competent evidence to the contrary. The most crucial contrary evidence was Dr. Edwards' testimony that the diagnosis of depression was error, and that some of Callecod's symptoms could be explained by the combination of anti-depressant medications he was taking. Although Dr. Edwards declined to opine directly that Callecod was fit for active service, the testimony of Callecod's supervisor and fellow troopers that they noticed no problems with his performance just before he went on leave, in spite of the symptoms Trooper Callecod said that he was experiencing at that time, indicates that Callecod was, in fact, able to perform, though perhaps only by expending a tremendous amount of personal effort.

█ Moreover, there is competent evidence in the record that Callecod may have been exaggerating some of his symptoms. The Board observed that symptoms demonstrated by Callecod while testifying were not displayed in informal situations before and after his testimony. The Board found it suspicious that the difficulties that Callecod claimed to have had in completing his work were not observed by his supervisor or co-workers, and that Callecod and his wife had taken measures to avoid contact with WSP members after Callecod went on leave. The Board's suspicions were supported by one of Callecod's own expert's testimony that Callecod's answers to questions about his symptoms indicated that he may have exaggerated some of them:

[Dr. Smith:] There was an exaggeration of symptoms. There

---

*Labor & Indus.*, 76 Wn. App. 600, 603, 886 P.2d 1147, *review denied*, 127 Wn.2d 1007 (1995); *but see Jerome v. State Employment Sec. Dep't*, 69 Wn. App. 810, 814, 850 P.2d 1345 (1993) (applying the "clearly erroneous" test despite the fact that the agency proceeding in that case began after July 1, 1989).

was clearly evidence in the testing that I did and also for Dr. Tracy.

[Counsel for WSP:] So in the validity scales that were performed on the test by Dr. Tracy that you reviewed and the test you administered, it demonstrated that there was an exaggeration?

[Dr. Smith:] Yes, that would be accurate.

Report of Proceedings at 305. We cannot say, therefore, that the Board's reasons for rejecting the opinions of Callecod's treating and examining physicians in favor of that of Dr. Edwards are unsound.[7]

■ Additionally, the Board and Chief were entitled to accept and rely on Dr. Edwards' testimony that if Callecod were in fact suffering from depression, he should have responded almost immediately to his medication but did not; and that while it is unusual for a depressed person to enjoy any type of work, Callecod enjoyed non-WSP work while on leave. Finally, Dr. Hanson, whose testimony is entitled to additional weight in that he was Callecod's treating physician,[8] was very optimistic that Callecod's prognosis was for full recovery in as little as 30 to 60 days, supporting the Board's conclusion that Callecod's condition was not permanent and that within a reasonable period of time he would be able to return even to line duty.

---

[7]The Board was required to state sound reasons for rejecting Callecod's treating physician's opinions. *Groff v. Department of Labor & Indus.*, 65 Wn.2d 35, 45, 395 P.2d 633 (1964). In rejecting these doctors' opinions, the Board also noted that it found it unusual that Callecod's doctors, who testified that they were experienced in treating police officers, did not take steps to have Callecod's service revolver removed from his possession, despite the fact that they expressed concern about Callecod's suicidal thoughts. We are unaware of any testimony regarding the standard of care in situations such as this. The parties have not briefed, and we thus do not address, confidentiality issues implicated by a doctor's report to the WSP of a trooper's communication to a treating physician outside the course of litigation. We are, therefore, unable, on the basis of this record and the parties' briefing, to determine whether this particular reason for rejecting the treating physician's opinions is faulty. Because the Board's other reasons appear to be sound, an analysis of this particular reason is unnecessary to the proper disposition of this appeal.

[8]*Groff*, 65 Wn.2d at 45.

We are satisfied that the Board's decision was supported by substantial evidence.[9]

■ Finally, Callecod contends that the Board's and Chief's decision was arbitrary and capricious because it ignored the evidence indicating that Callecod was unable to perform his job with the WSP. A decision is arbitrary and capricious if it is willful, unreasoning, and in disregard of facts and circumstances. *Heinmiller v. Department of Health*, 127 Wn.2d 595, 609, 903 P.2d 433, 909 P.2d 1294 (1995), *cert. denied*, 116 S. Ct. 2526 (1996). A decision that is supported by substantial evidence is not arbitrary and capricious, however, even though the evidence before the trier of fact may, as here, be of a conflicting nature. *Cf. State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce*, 65 Wn. App. 614, 617-18, 829 P.2d 217, *review denied*, 120 Wn.2d 1008 (1992) ("On issues of fact, we determine the competency and sufficiency of the evidence, which is the same as determining whether the decision below was arbitrary and capricious.") (footnote and citations omitted).

Affirmed.

---

[9]We reject the contention, made by Callecod's attorney at oral argument, that the substantial evidence test requires that the reviewing court, like a "fair-minded person," be persuaded of the truth or correctness of an order. Callecod correctly points out that the trial judge in this case stated that she personally would likely have ruled differently from the Board. But it does not matter that a reviewing court would likely have ruled differently had it been the trier of fact. The question, instead, is whether *any* fair-minded person could have ruled as the Board and the Chief did after considering all of the evidence. We cannot say that *no* fair-minded person would have accepted Dr. Edwards' testimony, notwithstanding the fact that he spent far less time with Callecod than the other physicians who testified, notwithstanding the fact that he admitted to a preconceived bias against workers seeking disability retirement benefits, and notwithstanding the superior experience of Callecod's examining physicians in working with disabled police officers. That we, like the trial court, likely would have decided this case in Callecod's favor had we been the triers of fact is irrelevant, because the standard of review does not permit us to substitute our judgment for that of the Board and the Chief on the credibility of witnesses or the weight to be given to conflicting evidence. *Cf. Freeburg v. City of Seattle*, 71 Wn. App. 367, 371-72, 859 P.2d 610 (1993) (issues of fact are reviewed to determine whether they are supported by substantial evidence; review is deferential and entails acceptance of factfinder's views regarding credibility of witnesses and weight to be given reasonable but competing inferences).

COLEMAN and ELLINGTON, JJ., concur.

Review denied at 132 Wn.2d 1004 (1997).