[No. 26580-0-II. Division Two. May 17, 2002.]

MANKE LUMBER COMPANY, INC., ET AL., *Appellants*, v. THE CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, ET AL., *Respondents*.

*William T. Lynn* and *Margaret Y. Archer* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim*), for appellant Manke Lumber Company.

*Warren E. Posten, pro se.*

*Samuel W. Plauche* and *Kitteridge Oldham* (of *Buck & Gordon*); *Russell D. Hauge, Prosecuting Attorney for Kitsap County*, and *Evelyn Sue Tanner, Deputy*; and *Christine O.*

*Gregoire, Attorney General*, and *Sharon S. Eckholm* and *Alan D. Copsey, Assistants*, for respondents.

*Christine O. Gregoire, Attorney General*, and *James R. Schwarz, Assistant*, on behalf of the Department of Natural Resources, amicus curiae.

HOUGHTON, J. — Manke Lumber Company, Inc., and Warren Posten, Sr. appeal from a superior court decision affirming a Central Puget Sound Growth Management Hearings Board determination that Kitsap County's Comprehensive Plan land designations complied with the Growth Management Act. We affirm.

## I. FACTS

### A. Background

This appeal involves Kitsap County's (the County) third attempt to comply with the Growth Management Act (GMA). The County's two previous attempts resulted in invalidation of its Comprehensive Plan. In the County's first attempt at complying with the GMA, the Central Puget Sound Growth Management Hearings Board (CPSGMB or Board) invalidated the County's 1994 Comprehensive Plan in its entirety. Clerk's Papers (CP) at 604, 665 (*Bremerton v. Kitsap County*, No. 95-3-0039c, 1997 WL 597031 (CPSGMB Final Dec. and Order Wash. Sept. 8 1997)). In the County's second attempt, the Board determined that significant portions of the County's 1996 Comprehensive Plan (1996 Plan) did not comply with the GMA and that the Plan was invalid. CP at 672, 722-23 (*Port Gamble v. Kitsap County*, No. 97-3-0024c, 1997 WL 597031 (coordinated with No. 95-3-0039c) (CPSGMB Finding of Noncompliance and Determination of Invalidity (Wash. Sept. 8, 1997)). Among other things, the Board invalidated the Rural Element and

Land Use Element(s), including the County's land use map and rural densities. CP at 722 (*Bremerton v. Kitsap County*, No. 97-2-0024c, 1997 WL 597031, CPSGMB (coordinated with 95-3-0039c)).

After numerous public hearings and county commissioner meetings, the County adopted the 1998 Comprehensive Plan (*1998 Plan*) on May 7, 1998. The Board found that the 1998 Plan was in compliance with the GMA.[1] It then rescinded the previous order of invalidity arising from the *Bremerton* case.[2] CP at 737, 833 (*Alpine v. Kitsap County*, No. 98-3-0032c, 1999 WL 68675 (CPSGMB Order Rescinding Invalidity and Final Dec. and Order Wash. Feb. 8, 1999)).

Manke Lumber Company, the Department of Natural Resources (DNR), and Warren Posten, Sr. appealed the Board's final decision and order to the Kitsap County Superior Court. The superior court rejected the petitioners' arguments that the Board erred and it affirmed the Board's decision. DNR did not appeal the superior court's decision, leaving Manke and Posten as the remaining appellants.

## B. The Manke Appeal

Manke owns approximately 2,000 acres of land in Kitsap County, some of it on the banks of Hood Canal. Under the 1998 Plan, most of Manke's land is subject to the Interim Rural Forest (IRF) designation.[3] The County designated 52,157[4] out of a possible total of 238,559 acres in the County

---

[1] On November 13, 2001, Warren Posten, Sr. moved to correct the record before us. We deferred hearing the motion pending oral argument. Our review discloses that no correction is now necessary. Therefore, we now deny the motion.

[2] Subject to some minor deficiencies not directly relevant to this appeal.

[3] IRF is one of four rural area designations in the 1998 Plan. Land designated as IRF has a density of 1 du (dwelling unit) per 20 acres. The other three rural area designations are Urban Reserve (density of 1 du per 10 acres), Rural Residential (density of 1 du per 5 acres), and Rural Protection (density of 1 du per 10 acres).

[4] The original IRF designation when the Plan was adopted on May 7, 1998 totaled 54,197 acres. The County revised the figure to 52,157 acres on November 30, 1998. This figure was again revised to the current 49,432 acres when the County passed Ordinance 229-1999 on February 8, 1999, designating 2,725 acres of previously designated IRF as Forest Resource Lands.

as IRF in its 1998 Plan (approximately 22 percent of the total amount of land in the County). The 1998 Plan defines IRF land as "larger parcels of land in contiguous blocks that are forested in character, that have been actively managed for forestry and harvested, and that are currently taxed as timber lands under state and county programs." Administrative Record (AR) at 8016.

In developing its 1998 Plan, the County completely discarded the Rural Element portion of its invalid and later repealed 1996 Plan. Instead, the County devised a new system to categorize its rural lands. Under the 1996 Plan, Manke's shoreline properties were designated Rural Wooded, which allowed a density of one dwelling unit per 1 to 2.5 acres.[5] The 1998 Plan designated Manke's shoreline properties (along with approximately 50,000 additional acres) as IRF, with a density of 1 dwelling unit per 20 acres.

Manke argues that the County's designation of its shoreline properties as IRF is invalid because the County failed to consider several factors in its planning. Specifically, Manke asserts that the IRF designation of its shoreline properties was arbitrary and lacked evidentiary support. In this appeal, Manke does not challenge the general validity of the IRF designation; rather, it challenges only the applicability of the designation to its own shoreline properties.

## C. The Posten Appeal

Posten owns a parcel of land in the Keyport area on the banks of Dyes Inlet. He operates a marina, boat dock, marine repair business, parking lot, and garage. He also has a single family residence on the property. Posten's commercial activities are allowed under a 1984 unclassified use permit (UUP) and a shoreline substantial development permit (SDP).

---

[5] The Board invalidated these densities because they promoted urban growth outside designated urban growth areas. Manke appealed that ruling to this court. Before we reached the merits of that appeal, the issue became moot because the County repealed the 1996 Plan in its entirety and replaced it with the 1998 Plan. *Manke Lumber Co. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, noted at 99 Wn. App. 1050 (2000) (unpublished).

The 1998 Plan and zoning ordinance designated all waterfront property in the Keyport area as Rural Residential. Posten's property was zoned commercial (Business General) before adoption of the 1998 Plan. The 1998 Plan and a zoning ordinance allow water-dependent and water-related uses within the shoreline via a conditional use permit (CUP)[6] and SDP, regardless of the zone classification. Expansion of these uses is allowed if a CUP is obtained.

The 1998 Plan did not designate Keyport as an urban growth area (UGA). The intent was that designated UGAs would accommodate most of the projected population growth in the County over the next 20 years. Keyport was designated a UGA under the repealed 1996 Plan, but in its efforts to develop a comprehensive plan that complied with the GMA, the County deleted Keyport as a UGA.

Posten appeals Keyport's removal from a UGA designation.

## II. ANALYSIS

### A. Standard of Review

We review the Board's decisions by applying the standards of the Administrative Procedure Act, chapter 34.05 RCW, directly to the record before it, sitting in the same position as the superior court. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000). The party asserting that the Board erroneously interpreted or applied the law, or that the Board's decision is not supported by substantial evidence, carries the burden of demonstrating the error. *King County*, 142 Wn.2d at 553; RCW 34.05.570(1)(a). We review the Board's legal conclusions de novo, giving substantial weight to its interpretation of the statutes it administers. *King County*, 142 Wn.2d at 553. We review the Board's findings of facts for substantial evidence under RCW 34.05.570(3)(e).

---

[6] The UUP is the predecessor to and equivalent of a CUP.

The test for substantial evidence is " 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *King County*, 142 Wn.2d at 553 (quoting *Callecod v. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

■ A Board's order is arbitrary or capricious under RCW 34.05.570(3)(i) if it is willful, unreasoning, and issued without regard to or consideration of the surrounding facts and circumstances. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). A Board order issued after due consideration is not arbitrary and capricious if there is room for two opinions, even if the reviewing court deems that the record would also support a different order. *City of Redmond*, 136 Wn.2d at 47.

Under the GMA, a county's comprehensive plan, development regulations, and amendments are presumed valid upon adoption, and the Board "shall find compliance unless it determines that the action . . . is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3); *Manke Lumber Co. v. Diehl*, 91 Wn. App. 793, 803, 959 P.2d 1173 (1998), *review denied*, 137 Wn.2d 1018 (1999). Finally, the appellant carries the burden to demonstrate a county's noncompliance with the GMA. RCW 36.70A.320(2).

B. Manke Property

1. The County's Interim Rural Forest Designation

Manke first contends that the Board erred in finding the County's IRF designation of rural shoreline properties did not violate the GMA. Manke characterizes the IRF designation as forest land. As such, Manke asserts that the Board should have applied the GMA definition of "forest land" to its shoreline property.[7] Manke argues that IRF-

---

[7] RCW 36.70A.030(8) defines "forest land" as

land primarily devoted to growing trees for long-term commercial timber production on land that can be economically and practically managed for such

designated land fits under the Resource Lands category, not the Rural Areas category.

The Board, in addressing Manke's petition, accepted the County's characterization of the IRF designation as a Rural Area density issue and not as a Resource Lands issue. On appeal, the superior court also found that "IRF designation is a rural designation[.]"[8] CP at 969.

 Manke argues that the County should not have been allowed to designate rural shoreline land as IRF, with its 20-acre minimum lot size requirement. Because of the 1998 Plan's presumption of validity, Manke must offer evidence to rebut that validity. RCW 36.70A.320(1), (2); *King County*, 142 Wn.2d at 552. Manke asserts that nothing in the record justifies applying a 20-acre lot zone to shoreline properties, that the County failed to conduct any studies or investigations to determine the most appropriate uses for these properties and, therefore, that the blanket 20-acre zoning was arbitrary.

Manke's bare assertions fall short of rebutting the presumption. First, the GMA does not require that local governments use any particular method to develop the rural element of their comprehensive plans. As long as their plans are guided by the GMA goals and tailored to local conditions, the plans are valid. Second, the GMA does not require local governments to devise "the best" plan but

---

production . . . and that has long-term commercial significance. . . . [T]he following factors shall be considered [when determining whether forest land can be designated]: (a) The proximity of the land to urban, suburban, and rural settlements; (b) surrounding parcel size and the compatibility and intensity of adjacent and nearby land uses; (c) long-term local economic conditions that affect the ability to manage for timber production; and (d) the availability of public facilities and services conducive to conversion of forest land to other uses.

[8] Although Manke argues that the IRF designation should be characterized as Resource Lands, the issue may be moot. One of the areas of noncompliance in the 1998 Plan was the failure of the County to designate whether it had forest lands of long-term commercial significance. The County later passed Ordinance 229-1999 on February 8, 1999, which designated 2,725 acres of previously IRF-designated land as Forest Resource Lands. Manke does not challenge the validity of this ordinance. The County's Comprehensive Plan now has a Forest Resource Lands designation, distinct from the Interim Rural Forest designation.

rather a plan that complies with the GMA and that is suitable for that local government. Finally, the GMA allows local governments wide discretion in developing their plans because they must abide by those plans.

Here, several of the stated goals of the Rural Element of the County's 1998 Plan include retaining rural character outside of urban areas, providing for a variety of rural densities, and preserving resource-based activities. AR at 8016 (1998 Plan at 63). To effect these goals, rural lands are divided into four classifications, with slightly different purposes, and allowing for a variety of densities.[9] Viewing these goals and designations in the context of two previously invalidated comprehensive plans, as well as the numerous opportunities for public participation and comment, the IRF designation of rural shoreline properties was neither arbitrary nor capricious.

## 2. Special Characteristics of Shoreline Properties

Manke also contends that the County should have used RCW 36.70A.070(5)(d) to allow higher density development along its shorelines. RCW 36.70A.070(5)(d)(i) allows for limited areas of more intensive rural development "consisting of the infill, development, or redevelopment of existing commercial, industrial, residential, or mixed use areas, whether characterized as shoreline development, villages, hamlets, rural activity centers, or crossroad developments." Manke argues that the legislature recognized the special characteristics of shoreline properties in enacting this statutory provision and that the 1998 Plan should have allowed more intensive rural development along shorelines. We disagree.

The Board and trial court properly found that the GMA does not require that the 1998 Plan allow for more intensive development along the shoreline. This provision clearly

---

[9] As previously described in footnote 3, the four categories are IRF (density of 1 du per 20 acres), Urban Reserve (density of 1 du per 10 acres), Rural Residential (density of 1 du per 5 acres), and Rural Protection (density of 1 du per 10 acres).

indicates a permissive, not mandatory posture. *See* RCW 36.70A.070(5)(d) (stating that the rural element of a county's comprehensive plan "may allow for limited areas of more intensive rural development"). Given the wide discretion local governments have to develop their comprehensive plans, the County acted within its discretion. Manke's argument fails.

### 3. Failure to Consider All Planning Factors

Manke finally contends that the Board erred in finding that the IRF designation of its shoreline properties did not violate the GMA because the County failed to consider 2 of the 13 planning factors in developing this land designation in the 1998 Plan. Manke asserts that the County did not consider the protection of property rights and the availability of affordable housing.[10]

As noted, local governments have wide discretion in developing comprehensive plans and development regula-

[10] RCW 36.70A.020 lists 13 planning goals to guide local governments in developing their comprehensive plans and development regulations. They include:

1) Encourage development in urban areas.

2) Reduce sprawl.

3) Encourage efficient multimodal transportation systems.

4) Encourage the availability of affordable housing to all economic segments of the population.

5) Encourage economic development.

6) Protect property rights of landowners from arbitrary and discriminatory actions.

7) Processing the applications of permits in a timely manner.

8) Maintain and enhance natural resource-based industries, encourage the conservation of productive forest lands and agricultural lands, and discourage incompatible uses.

9) Encourage the retention of open space and development of recreational opportunities, conserve fish and wildlife habitat, increase access to natural resource lands and water.

10) Protect the environment.

11) Encourage citizen involvement in the planning process to reconcile differences.

12) Ensure adequate levels of public facilities and services.

13) Identify and encourage the preservation of historical and archaeological sites.

tions to fit local conditions. *King County*, 142 Wn.2d at 560. Although local governments must develop plans within the framework of GMA goals and requirements, the Board gives deference to the local government decisions. *King County*, 142 Wn.2d at 561; RCW 36.70A.3201.

Again, because of the presumption of validity afforded the County's 1998 Plan, Manke must produce evidence to rebut it. Essentially, Manke must show that the County's process in developing the 1998 Plan failed to be *guided* by the 13 enumerated GMA planning goals.

As evidence that the County's planning was not guided by the property rights planning goal, Manke points to the lack of documentation in the record that the County considered this factor in developing its comprehensive plan. Manke relies on a 1992 Washington Attorney General Opinion (1992 Op. Att'y Gen. No. 23) for the proposition that the County must specifically consider and weigh the effects of land regulation on private property. Manke also cites *Diehl v. Mason County*, 94 Wn. App. 645, 972 P.2d 543 (1999) to support its argument that "the local government must provide an appropriate explanation for its planning decisions[,] . . . [and] [t]he absence of such an explanation . . . can result in invalidation of the comprehensive plan." Manke Opening Br. at 12.

No provision in the GMA specifically requires that local governments discuss, address, and weigh any of the 13 planning goals in developing their comprehensive plans.[11] In fact, the attorney general opinion states that no one factor prevails over any other and also recognizes that some of these goals conflict with one another. 1992 Op. Att'y Gen. No. 23. The five mandatory components of a comprehensive plan include a land use element, a housing element, a capital facilities element, a utilities element, and a rural element. RCW 36.70A.070. As stated in the GMA, the

---

[11] Manke relies on 1992 Op. Att'y Gen. No. 23 as persuasive authority. Although the attorney general opinion is helpful, we are not bound by it. *City of Seattle v. State*, 136 Wn.2d 693, 703, 965 P.2d 619 (1998) (opinions of the Attorney General are entitled to considerable weight, but are not controlling).

purpose of the 13 planning goals is "to guide the development and adoption of comprehensive plans and development regulations." RCW 36.70A.020. The clear intent is to allow local governments wide discretion in tailoring comprehensive plans to their local conditions within the framework and guidelines of statewide goals. RCW 36.70A.3201.

We agree with the Board and the superior court that the County adequately weighed the GMA goals in developing the 1998 Plan. Kitsap County Board of Commissioners entered the following findings in passing Ordinance 215--1998, which adopted the 1998 Plan, "The Land Use Element and the Rural Element . . . are guided by the planning goals of the GMA." (Kitsap County Br. App. E § 1.43) and further, "In reviewing the 1998 Plan, the Commissioners have considered the goals and policies of the GMA and have balanced and harmonized those goals to the extent possible." (Kitsap County Br. App. E § 1.54). Manke does not dispute these findings and we accept them as verities on appeal. *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 123, 615 P.2d 1279 (1980) (unchallenged findings of fact become verities on appeal). These provisions in turn support the Board's and trial court's findings that the County adequately weighed the protection of private property rights.

Similarly, Manke bears the burden of showing that the County did not consider the goal of promoting affordable housing in developing the 1998 Plan. Manke argues, "Imposing densities of 1 unit per 20 acres on shoreline parcels will make them prohibitively expensive to own and maintain. . . . [T]he price of a single 20 acre lot would exceed $800,000." Manke Opening Br. at 37-38. Manke posits that the County's decision to designate undeveloped shoreline property as IRF must support the goal of promoting affordable housing, otherwise the designation is invalid. No GMA provision requires such a result. The only requirement is for counties and cities to keep the goal of promoting affordable housing in mind (along with the other 12 goals) in developing their comprehensive plans.

As support for its argument, Manke asserts that reducing the minimum lot size to 2.5 or 5 acres would promote affordable housing in the County. Manke premises its argument on the assumption that reducing the lot size will reduce the cost, thus allowing for more people to afford to build homes and live on the shoreline. Manke offers no evidence of the current housing stock in the County, much less the location of the housing stock. Manke also does not offer any evidence of the County population's future housing needs by type, size, location, or cost.

On the other hand, the 1998 Plan devotes an entire chapter (Housing Chapter) and appendix (Housing Appendix) detailing the housing inventory, historical and current housing trends, availability of affordable housing, future housing needs, etc. AR at 8059-66, 8291-8310. The County clearly demonstrated that it fully considered this goal in developing its comprehensive plan. Thus, the Board adequately weighed this factor. Manke's argument to the contrary fails.

## C. Posten Property

### 1. The 1998 Plan's Inconsistencies

Posten first contends that the Board erred in determining that the County complied with the GMA in designating his property as Rural Residential. He first asserts that the 1998 Plan is invalid because of an inconsistency between the Comprehensive Plan Land Use Map, the written introduction in the 1998 Plan Land Use Appendix and Bibliography, and the County Land Assessor's map. Posten argues that the introduction in the Land Use Appendix, which states, "Most of the information for the Land Use Inventory was taken from the Assessor's records[,]" AR at 8157, 1998 Plan at A-55, and the Bibliography, which states, "Existing Land Use based on Assessor's records, classifies by parcel size and type of land use[,]" AR at 8413, are inconsistent with the Land Use Map (which depicts his property as

Rural Residential) and the Assessor's records (which show his property as commercial).

▇▇▇▇ Posten did not raise this issue before the Board nor in his appeal to the superior court. An issue not raised before an agency may not be properly raised on appeal. RCW 34.05.554(1). Generally, we will not consider issues raised for the first time on appeal. We decline to do so here. *Wells v. W. Wash. Growth Mgmt. Hearings Bd.*, 100 Wn. App. 657, 681, 997 P.2d 405 (2000); RAP 2.5(a).

### 2. Keyport's Invalidation as an Urban Growth Area

Posten next contends that the Board erred in invalidating the portion of the 1998 Plan that failed to designate Keyport as a UGA. Posten appeared to have abandoned this issue during oral argument at the trial court level. During that argument, Posten stated, "I don't care if Keyport is a UGA or not." Report of Proceedings (June 29, 2000) at 51 (proceedings concluding at 2:05 P.M.). The trial court then found that Posten did not hold a legal position as to whether Keyport should be designated a UGA.

▇▇▇▇ Even assuming Posten did not abandon this argument, the Board previously rejected Keyport's designation as a UGA. The Board properly found that after correctly sizing the various UGAs based on projected population growth, the County had the discretion to designate and locate the UGAs to best meet its needs. RCW 36.70A.3201 allows local governments to exercise this discretion. Posten mistakenly relies on the belief that an area possessing some urban features mandates designating it as a UGA, or that the former characterization of Keyport as a UGA compels the same classification.[12] In addition, the County notes that Keyport has a total of only five acres of unencumbered land

---

[12] The repealed 1996 Plan designated Keyport as a UGA. One of the reasons the Board invalidated the 1996 Plan was because the aggregate UGA was too big for the projected population growth. In its 1998 Plan, the County reduced the size of several UGAs while also deleting others (such as Keyport) to comply with the order of invalidity. Posten incorrectly relies in part on the invalid 1996 designation to support his position.

for future expansion.[13] The County reasonably selected other UGA locations with room for future growth. Posten fails to show that the Board erred in validating the County's decision.

### 3. Due Process Argument

Posten also asserts a violation of his constitutional right to due process because he did not receive personal notice of the "down zone" of his property. He argues this arbitrary action amounts to a regulatory taking. This argument lacks merit. The record discloses Posten's involvement in this matter from the County level to the Board level to the superior court level and to this court. Posten was present at public hearings, wrote letters to county commissioners, and filed documents with the Board and in the courts.

 ██ But even assuming that Posten's due process argument has some merit, it is unclear how the Rural Residential designation detrimentally affects any of Posten's property use. All his present uses are allowed with the various permits in his possession. Furthermore, at the superior court, he expressed no desire to expand his current commercial activities. If he wishes to expand his operations, he may do so through an additional CUP. A takings claim requires some indication that the regulatory scheme is so onerous as to render the property completely without economic viable use. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992); *Manufactured Hous. Cmtys. v. State*, 142 Wn.2d 347, 355, 13 P.3d 183 (2000). *See also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002) (a 32-month moratorium on development not a regulatory taking because it is only temporary, not permanent). Without a showing of harm, Posten's constitutional argument fails.

---

[13] Keyport is bounded on three sides by water and on the fourth side by a naval base.

### 4. Attorney Misconduct

■ Finally, Posten contends that the lawyers representing the County and the Board members engaged in misconduct. Posten sets forth no argument in his brief and we decline to address this assignment of error. *Diehl v. Mason County*, 94 Wn. App. 645, 651, 972 P.2d 543 (1999) (an assignment of error not supported by argument or authority is deemed waived) (citing *Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986)).

Affirmed.

MORGAN and SEINFELD, JJ., concur.

Reconsideration denied June 20, 2002.

Review denied at 148 Wn.2d 1017 (2003).