IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BROOKS MANUFACTURING CO., a Washington corporation, | ) ) ) | No. 79645-3-I |
| Appellant, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| NORTHWEST CLEAN AIR AGENCY, | ) ) | |
| Respondent. | ) ) ) | FILED: September 16, 2019 |

LEACH, J. — Brooks Manufacturing Company appeals a superior court order affirming the Pollution Control Hearings Board (PCHB). RCW 70.94.153 requires a person to file a notice of construction application when he intends to replace emission control technology on a stationary source emission unit. Brooks did not do this before it replaced its baghouse, the device it uses to control emissions escaping from its burning of wood shaving by-products. The Northwest Clean Air Agency (NWCAA) issued Brooks a notice of violation and corrective action order. Brooks appealed to the PCHB, which affirmed the notice. The superior court affirmed the PCHB.

Brooks claims that the baghouse was not "emission control technology" and that it did not replace the baghouse. Because Brooks does not show that

the PCHB erred in its interpretation and application of the statute and substantial evidence supports the PCHB's challenged finding of fact, we affirm.

FACTS

Brooks is a Bellingham, Washington, company that makes engineered wood products for utilities and produces wood shavings as a by-product. Brooks uses a boiler to provide steam for its lumber-drying kiln. In 1989, it converted the boiler from gas fired to wood burning to allow it to burn the wood shaving by-product to produce steam for the kiln. The baghouse captures fine particulate matter emitted from the wood-fired boiler.

In 2007, Brooks's baghouse was corroding, and its skin and hopper were deteriorating from rust. Superior Systems Inc. submitted a bid to "supply & install a replacement baghouse" for Brooks's existing boiler. Superior installed the replacement baghouse in 2008.

Brooks noticed that the baghouse was in failing condition again in 2013. Superior submitted a bid to "supply & install a replacement baghouse." Its bid stated that it would "dismantle the existing filter and install the new [one] in the same location." It said it would reuse the "existing service platform access ladder and lower support structure. All the rest of the [baghouse would] be fabricated new."

No. 79645-3-I / 3

In August 2014, Superior replaced the mild steel baghouse shell with a stainless steel one. It installed the new shell in the existing support structure. Superior replaced all of the parts that came into contact with exhaust air from the boiler with identically sized stainless steel parts. These included the baghouse collector housing, the exhaust outlet, the clean gas plenum, the tube sheet, the gas inlet, and the hopper. It did not replace parts that did not come into contact with exhaust air, including the magnehelic, controls and electrical conduit, inlet piping, catwalks, and ladder. It also did not replace the existing filter bags and cages, the pulse air header, or the valves.

Brooks did not contact the NWCAA before or after Superior did the baghouse work in August 2014. In November 2014, an NWCAA inspector examined the baghouse and talked with Brooks's technical director. The inspector then relayed a description of the changes to an NWCAA engineer to determine whether Brooks was required to file a notice of construction for the baghouse work. The inspector wrote, "Facility said that this [was a] like-for-like replacement for the baghouse that was permitted March 10, 1989. The new baghouse is the same design and size with the only difference . . . being that it was constructed of stainless steel. This baghouse collects ash from the 250 hp wood fired boiler exhaust."

No. 79645-3-I / 4

The engineer concluded that Brooks "replaced" the baghouse, making its action subject to the requirements of RCW 70.94.153. The NWCAA director of compliance agreed. On December 15, 2014, the NWCAA issued Brooks a notice of correction and corrective action because it did not submit the statutorily required notice of construction application before replacing the baghouse in 2014.

Brooks appealed the notice to the PCHB. After a fact-finding hearing, the PCHB affirmed the NWCAA's determination, concluding that "the work performed in 2014 on the Brooks baghouse constituted replacement and therefore a notice of construction application was required." Brooks appealed this decision to the superior court, which affirmed the PCHB. Brooks again appeals.

STANDARD OF REVIEW

The Washington Administrative Procedure Act (WAPA)[1] governs review of PCHB orders.[2] This court reviews the PCHB's action from the same position as the superior court.[3] We apply WAPA standards directly to the record created before the PCHB.[4] When we review agency action under WAPA, the party

---

[1] Ch. 34.05 RCW.
[2] RCW 43.21B.180; Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 587, 90 P.3d 659 (2004); RCW 34.05.510, .526.
[3] Port of Seattle, 151 Wn. 2d at 587; Skagit Hill Recycling, Inc. v. Skagit County, 162 Wn. App. 308, 317-18, 253 P.3d 1135 (2011); RCW 34.05.558.
[4] Port of Seattle, 151 Wn. 2d at 587; Skagit Hill Recycling, 162 Wn. App. at 317-18; RCW 34.05.558.

challenging the action has "[t]he burden of demonstrating the invalidity of agency action."[5]

We interpret statutes de novo.[6] When we interpret a statute, our goal is to "give effect to the legislature's intent."[7] So we look first to the legislation's plain language, "considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole."[8] If the plain language of the statute results in two or more reasonable interpretations, it is ambiguous.[9] Only if the statute is ambiguous do we apply traditional techniques of statutory construction.[10]

A court must grant relief from a PCHB order if the party challenging it shows that the order was not supported by substantial evidence "when viewed in light of the whole record before the court."[11] Substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order."[12] We will overturn an agency's findings only if they are clearly erroneous and the court is "'definitely and firmly convinced that a mistake has

---

[5] RCW 34.05.570(1)(a); Port of Seattle, 151 Wn.2d at 587.
[6] Port of Seattle, 151 Wn.2d at 587.
[7] TracFone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010).
[8] State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).
[9] City of Seattle v. Winebrenner, 167 Wn.2d 451, 456, 219 P.3d 686 (2009).
[10] Cerrillo v. Esparza, 158 Wn.2d 194, 201, 142 P.3d 155 (2006).
[11] RCW 34.05.570(3)(e).
[12] Callecod v. Wash. State Patrol, 84 Wn. App. 663, 673, 929 P.2d 510 (1997).

been made.'"[13] This court does "not weigh the credibility of witnesses or substitute our judgment for the PCHB's with regard to findings of fact."[14] We review de novo whether the PCHB correctly applied the law to its findings.[15]

## ANALYSIS

Brooks makes two challenges to the PCHB decision. First, it contends that the PCHB "erroneously interpreted . . . the law"[16] about the terms "emission control technology" and "replacement or substantial alteration" contained in RCW 70.94.153. And these asserted misinterpretations resulted in the PCHB erroneously applying the law to the facts.[17] Second, it claims that substantial evidence did not support the PCHB's finding of fact 30.[18] And Brooks concludes by claiming that given the legislative intent of RCW 70.94, it is entitled to operate under its 1989 permit indefinitely. Because Brooks's arguments fail, we affirm.

### The Baghouse Is Emission Control Technology

First, Brooks contends that the baghouse is not "emissions control technology" under the Washington Clean Air Act (Act).[19] We disagree.

The legislature adopted the Act with the intent

---

[13] Port of Seattle, 151 Wn.2d at 588 (quoting Buechel v. Dep't of Ecology, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)).
[14] Port of Seattle, 151 Wn.2d at 588 (citing Bowers v. Pollution Control Hr'gs Bd., 103 Wn. App. 587, 596, 13 P.3d 1076 (2000)).
[15] Port of Seattle, 151 Wn.2d at 588.
[16] RCW 34.05.570(3)(d).
[17] RCW 34.05.570(3)(d).
[18] RCW 34.05.570(3)(e).
[19] Ch. 70.94 RCW; see RCW 70.94.440.

to secure and maintain levels of air quality that protect human health and safety, including the most sensitive members of the population, to comply with the requirements of the federal clean air act, to prevent injury to plant, animal life, and property, to foster the comfort and convenience of Washington's inhabitants, to promote the economic and social development of the state, and to facilitate the enjoyment of the natural attractions of the state.[20]

The legislature declared as one of the purposes of the Act "to safeguard the public interest through an intensive, progressive and coordinated statewide program of air pollution prevention and control."[21] Consistent with this goal, RCW 70.94.153 requires that

[a]ny person proposing to replace or substantially alter the emission control technology installed on an existing stationary source emission unit shall file a notice of construction application with the jurisdictional permitting authority. For projects not otherwise reviewable under RCW 70.94.152 [governing the notice requirements for the construction of a new contaminant source], the permitting authority may (1) require that the owner or operator employ reasonably available control technology for the affected emission unit and (2) may prescribe reasonable operation and maintenance conditions for the control equipment.

(Emphasis added.)

The parties agree that RCW 70.94.153 applies to the baghouse work only if the baghouse is "emission control technology." They also agree that the Act does not define "emission control technology." They offer competing interpretations of this term.

---

[20] RCW 70.94.011.
[21] RCW 70.94.011.

The PCHB interpreted the phrase to be "an umbrella term that includes the equipment and devices used for emission control and the more abstract concept of the applied science upon which the equipment and devices are based." And, quoting a dictionary definition of "technology,"[22] Brooks asserts that "emission control technology" has a narrower meaning and includes only abstract things like "science, a method, study, or a process" and does not include tangible objects. In particular, it does not include the actual equipment used to capture or filter the emissions. The text of RCW 70.94.153 and the quoted purpose of the Act support the PCHB's interpretation.

First, Brooks contends that the Act's plain language does not support a broad meaning for "emission control technology." In response, PCHB notes that the first sentence of RCW 70.94.153 describes "emission control technology" as something that can be "installed on an existing stationary source emission unit." The legislature's use of the word "installed" makes clear that it considered "emission control technology" to include tangible objects that one could attach to

_____

[22] Webster's New World College Dictionary 1470 (4th ed. 2000) defines "technology" as

> 1 The science or study of the practical or industrial arts, applied sciences, etc. 2 the terms used in a science, etc.; technical terminology 3 applied science 4 a method, process, etc. for handling a specific technical problem 5 The system by which a society provides its members with those things needed or desired

a stationary emission unit. So, the plain language of the statute supports the PCHB's interpretation.

Second, Brooks points to the legislature's use of the phrase in other sections of the Act as supporting its interpretation. For example, RCW 70.94.030(6) defines "[b]est available control technology" as "an emission limitation . . . that the permitting authority . . . determines is achievable . . . through application of production processes and available methods, systems, and techniques." Similarly, RCW 70.94.030(20) defines "[r]easonably available control technology" as "the lowest emission limit that a particular source . . . is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility."

But these examples and the others cited by Brooks do not support a narrow definition of "emission control technology." Because we look for a meaning that harmonizes all the legislature's uses of the same phrase in the Act,[23] the different ways it used this phrase demand a broad definition, not a narrow one. And we must avoid an interpretation that creates an inconsistency among the various statutes using the phrase.[24] The narrow abstract meaning advanced by Brooks would make RCW 70.94.153 nonsensical. Brooks does not

---

[23] Dep't of Revenue v. Fed. Deposit Ins. Corp., 190 Wn. App. 150, 157-58, 359 P.3d 913 (2015).
[24] State v. Bash, 130 Wn.2d 594, 602, 925 P.2d 978 (1996).

explain how one could attach "science, a method, study, or a process" to an existing stationary emission unit. But his offered definition would make this the event triggering the need for a notice of construction application.

Requiring review of devices used to control emissions when existing devices need replacement furthers the legislatively declared "public policy to preserve, protect, and enhance the air quality for current and future generations."[25] The interpretation of "emission control technology" advanced by Brooks would allow a polluter to use and replace once-approved devices forever, regardless of advances in technology occurring during the useful life of an approved device. This would frustrate using technological advances to "enhance the air quality for current and future generations."

We agree with the PCHB that the legislature used "emission control technology" as "an umbrella term that includes the equipment and devices used for emission control and the more abstract concept of the applied science upon which the equipment and devices are based." The PCHB did not err in concluding that "emission control technology" includes the baghouse.

<u>Brooks Replaced the Baghouse</u>

Brooks also claims that RCW 70.94.153 does not apply because it did not "replace" the baghouse. Brooks challenges the sufficiency of the evidence

---

[25] RCW 70.94.011.

supporting the PCHB's finding that it replaced the baghouse. It also challenges the PCHB's conclusions of law that "the work performed in 2014 on the Brooks baghouse constitutes replacement," that it was not a "similar parts replacement," and that "[t]he replacement of 90 percent of a baghouse, using mostly new parts and a new shell fabricated from a different, more expensive, and much longer lasting material, constitutes replacement of emission control technology." We reject these claims.

i. Substantial Evidence Supports the PCHB Finding That Brooks Replaced the Baghouse

Brooks challenges the sufficiency of the evidence to support finding of fact 30:

> At the hearing, after having an opportunity to review additional information, including all of the information about exactly which parts were replaced and the cost of the replacement, Mr. Mahar's opinion remained unchanged that the alteration of the Brooks baghouse constituted a replacement of the baghouse that required a notice of construction application. Mr. Mahar's original opinion was bolstered by: (1) that the fabrication took place off site and what he considered the replacement baghouse was then brought on site; (2) that Brooks made a substantial investment in stainless steel to extend the life of the baghouse; and (3) that the parts that were not replaced were primarily parts that did not come into contact with exhaust air, were not parts that were involved in the control of air emission, or were parts that had already been replaced recently because they were consumable, such as the filter bags. Overall, Mr. Mahar summed up the situation by saying the baghouse had been 90 percent replaced and he still concludes that the work constituted replacement of the baghouse. D. Mahar Testimony, Ex. R-31.

No. 79645-3-I / 12

Brooks first contends that this finding was not supported by substantial evidence because the PCHB based it on a single statement by Daniel Mahar.[26] This does not matter. Brooks cites no authority for the proposition that one witness's testimony is insufficient to support a finding of fact. And no witness directly contradicted Mahar. The finding accurately summarizes Mahar's testimony. Mahar stated, "90 percent of the baghouse was replaced," the "whole baghouse" was "basically rebuilt," and the metal used was "a significant portion of the baghouse that makes it work and contains all the dirty air and functions to clean it." He said, "[T]o me it was replaced."

Brooks directs this court to Mahar's testimony identifying "all of the parts that were [reused], including the structure, the ladder and catwalk, the airlock, the blow pipes, and even the bags and cages." But these statements do not contradict his testimony that the baghouse was replaced. Rather, Mahar listed these as examples of "options that you add on there to make it convenient to service the equipment" or equipment that is "replaced on a regular basis" to support his contention that the more functionally important parts of the baghouse were replaced.

Brooks also points to the diagram of the parts replaced and the parts not replaced on the baghouse and a portion of Mark Wolfe's testimony that Superior

_____

[26] Daniel Mahar is a professional environmental engineer or permit engineer at NWCAA.

-12-

reused some of the baghouse parts.[27]  But this evidence is not inconsistent with the PCHB's finding.  And in asserting that this evidence contradicts this finding, Brooks ask this court to reweigh evidence and determine credibility, which this court will not do.[28]  Brooks does not show the lack of substantial evidence to support the court's finding.

ii. Brooks's Baghouse Work Is a Replacement Subject to RCW 70.94.153

Brooks claims its baghouse work is not a replacement that triggers the application requirement of RCW 70.94.153.

This statute obligates "[a]ny person proposing to replace or substantially alter the emission control technology installed on an existing stationary source emission unit shall file a notice of construction application with the jurisdictional permitting authority."[29]  NWCAA does not claim that Brooks "substantially altered" its emissions with its baghouse work.  It claims that Brooks's baghouse work falls within the actions the legislature described with the word "replace."

The Act does not define "replace."  And it does not describe when a company replaces enough parts of an emission control device for its action to qualify as replacement.  The parties assert different, reasonable interpretations of the statute, making it ambiguous.  To interpret an ambiguous statute, we may

---

[27] Mark Wolfe is the general manager and part owner of Superior Systems Inc.

[28] Port of Seattle, 151 Wn.2d at 588 (citing Bowers, 103 Wn. App. at 596).

[29] RCW 70.94.153 (emphasis added).

-13-

look to a dictionary definition of an undefined term.[30]   Merriam Webster's Third New International Dictionary defines "replace" as "to place again : restore to a former place, position, or condition."[31]

Brooks's work on the baghouse restored it to its former condition and more.  The new parts put the corroded baghouse in a condition superior to its condition before the corrosion.  Superior replaced mild steel parts exposed to exhaust with more expensive stainless steel parts.  These last longer and extended the baghouse's useful life longer, perhaps indefinitely.  For this reason, we reject Brooks's claim that it was merely a similar parts replacement.

And Superior described its work as "dismantle the existing [baghouse] and install [a] new [one] in the same location."  It said that it would reuse the "existing . . . platform, access ladder and lower support structure" but that "[a]ll the rest of the [baghouse would] be fabricated new."

In addition, Brooks does not challenge the PCHB finding that "[t]he boiler was shut down for two weeks in August 2014. . . . During the shutdown, the old baghouse shell was removed from the Brooks site and the new one, fabricated by Superior out of stainless steel, was brought in and placed into the existing support structure."

---

[30] Buchheit v. Geiger, 192 Wn. App. 691, 696, 368 P.3d 509 (2016) (citing Cornu-Labat v. Hosp. Dist. No. 2, 177 Wn.2d 221, 231-32, 298 P.3d 741 (2013)).
[31] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1925 (2002).

-14-

Dan Mahar testified that the "whole baghouse" was "basically rebuilt" and that the metal used was "a significant portion of the baghouse that makes it work and contains all the dirty air and functions to clean it." The parts of the baghouse Superior did not exchange for new parts were "options that you add on there to make it convenient to service the equipment" such as the ladder or equipment that is "replaced on a regular basis," such as the bags.

Using a plain dictionary definition of the word "replace," the unchallenged findings and the evidence of Superior and Mahar show that Brooks's baghouse work was a replacement subject to the application requirements of RCW 70.94.153.

### Brooks Is Not Entitled To Operate Indefinitely under Its 1989 Permit

Brooks contends that it is entitled to operate under its 1989 permit indefinitely. It claims that "once a permit is issued, it is 'good forever.'" As noted above, the legislature intended the Act to "secure and maintain levels of air quality that protect human health and safety" through "an intensive, progressive, and coordinated statewide program of air pollution prevention and control."[32] A "good forever" permit to emit pollutants would frustrate this purpose. Brooks makes no persuasive argument to the contrary.

---

[32] RCW 70.94.011.

-15-

Instead, Brooks raises the specter of environmental review. It states that by filing a notice of construction application, it may trigger the State Environmental Policy Act[33] or that its baghouse may be subject to a reasonably available control technology analysis that could result in a change of its operating permit conditions. But the issue before this court is whether RCW 70.94.153 obligated Brooks to file a notice of construction. We conclude that it was. Brooks's fear of regulatory review has no place in our analysis.

## CONCLUSION

We affirm. Brooks fails to establish that the PCHB made a finding unsupported by substantial evidence or misapplied the law. The baghouse is emissions control technology, and Brooks replaced it. This action subjected Brooks to the requirements of RCW 70.94.153, which obligated it to file a notice of construction.

Leach, J.

WE CONCUR:

---

[33] Ch. 43.21C RCW.