[No. 22540-9-II. Division Two. March 5, 1999.]
JOHN E. DIEHL, ET AL., *Respondents*, v. MASON COUNTY, *Appellant*, PETER E. OVERTON, ET AL., *Intervenors*.

---

*Gary P. Burleson, Prosecuting Attorney,* and *David B. St. Pierre, Deputy,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Marjorie T. Smitch, Assistant; Thomas R. Bjorgen* of *Meeks Morgan Bauer, P.L.L.C.;* and *Kevin W. Teague* of *Foster Pepper Shefelman, P.L.L.C.,* for respondents.

*John E. Diehl,* pro se.

*John C. McCullough, Jr.,* of *Phillips, McCullough, Wilson, Hill & Fikso, P.S.;* and *Peter Overton* of *Overton & Associates,* for intervenors.

*William T. Lynn* of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* for Manke Lumber Co.

BRIDGEWATER, C.J. — Mason County adopted a comprehensive growth management plan as required by the Growth Management Act (GMA). The Western Washington Growth Management Hearings Board invalidated the plan because it did not comply with several GMA requirements. Mason County appeals from the superior court's order affirming the Board. We affirm.

The Legislature enacted the GMA, RCW 36.70A.010-.902, to minimize threats that unplanned growth poses to the environment, economic development, and public welfare. RCW 36.70A.010. Its goals include, among others, reducing sprawl, encouraging development in areas already characterized by urban development, preserving open spaces and the environment, and encouraging availability of affordable housing. *See* RCW 36.70A.020.

The GMA requires communities to coordinate and produce comprehensive land use plans (CPs) and development regulations (DRs), in accordance with the GMA framework. RCW 36.70A.040. Local governments are accorded a great deal of latitude and discretion in creating their CPs and DRs according to local needs, growth patterns, and resources. RCW 36.70.010-.901. However, in doing so, the local governments must still comply with certain requirements set forth in the GMA.

After a long process of public hearings and meetings between municipalities and local groups, Mason County passed its CP and DRs in 1996. Respondents[1] filed a petition with the Board challenging the plan, arguing it did not comply with the GMA. The Board heard the challenge and

---

[1]The petition was brought by John E. Diehl, Gordon Jacobson, Warren Dawes, Jutta Riediger, Vern Rutter, and Kerry Holm, individually and as members of the Mason County Community Development Council, and the City of Shelton, which was later dismissed. They will be referred to collectively as Respondents throughout.

determined that the plan did not comply with the requirements of the GMA in several areas. It issued an order remanding the CP and DRs to Mason County to reevaluate and to bring them into compliance with the GMA.

■ Mason County appealed to the Mason County Superior Court. The trial court reviewed the evidence and heard oral argument, then affirmed the Board's order. Mason County appeals, contending that the Board overstepped its authority by invalidating the County's CP and DRs. Mason County presents 31 issues in its assignments of error. We will address only those issues specifically argued in the brief, as an assignment of error not supported by argument or authority is deemed waived. *See Smith v. King*, 106 Wn.2d 443, 451-52, 722 P.2d 796 (1986).

## I. Standard of Review

The Board hears and determines petitions alleging that CPs and DRs are not in compliance with the GMA. RCW 36.70A.280. "The board shall base its decision on the record developed by the city, county, or the state and supplemented with additional evidence if the board determines that such additional evidence would be necessary or of substantial assistance to the board in reaching its decision." RCW 36.70A.290(4).

■ Local governments have broad discretion in developing CPs and DRs tailored to local circumstances. But this discretion is limited by the requirement that the final CPs and DRs be "consistent with the requirements and goals" of the GMA. *See* RCW 36.70A.3201.

When reviewing a petition alleging noncompliance with the GMA, the Board must presume the validity of the CPs and DRs and "shall find compliance unless it finds by a preponderance of the evidence that the . . . county . . . erroneously interpreted or applied this chapter." Former

RCW 36.70A.320(1) (1996);[2] WAC 242-02-632. The Board may invalidate part or all of a CP and DRs if it determines that the "continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of" the GMA. RCW 36.70A.302(1)(b); former RCW 36.70A.300(2)(a) (1995). The burden of proof at the Board level is on the party alleging noncompliance. RCW 36.70A.320(2).

We review the Board's decision from the same vantage point as the trial court. *See Manke Lumber Co. v. Diehl*, 91 Wn. App. 793, 801, 959 P.2d 1173 (1998). The Board's findings of fact are reviewed for substantial evidence. *See Jefferson County v. Seattle Yacht Club*, 73 Wn. App. 576, 588, 870 P.2d 987, *review denied*, 124 Wn.2d 1029 (1994). We review the Board's legal conclusions de novo, while giving substantial weight to its interpretation of the statute it administers. *See Manke*, 91 Wn. App. at 802. The party challenging the validity of an agency action has the burden of demonstrating its invalidity. RCW 34.05-.570(1)(a).

Under the Administrative Procedure Act, this court may grant relief from "an agency order in an adjudicative proceeding" if the order is, among others, unconstitutional, exceeds the agency's authority or jurisdiction, erroneously interprets or applies the law, is not supported by substantial evidence, or is arbitrary or capricious. RCW 34.05.570(3). Mason County challenges the Board's order on each of these grounds.

## II. Mason County's Comprehensive Plan

### A. Urban Growth Areas

Respondents contend that Mason County did not use the proper population projections when setting the size of its urban growth areas (UGAs) and, therefore, the land al-

---

[2]After the Board heard the instant challenge, the Legislature amended this provision to require a finding that the County's plan is clearly erroneous. *See* RCW 36.70A.320(3); Laws of 1997, ch. 429, § 20(3).

locations for urban use are wrong. When determining how much land to allocate for urban growth, the GMA requires that:

> Based upon the growth management population projection made for the county by the office of financial management, the county and each city within the county shall include areas and densities sufficient to permit the urban growth that is projected to occur in the county or city for the succeeding twenty-year period. . . . ·

RCW 36.70A.110(2). Respondents argue that counties and cities must use the office of financial management (OFM) projections. Mason County did not because it determined the OFM estimates were too low. Instead, Mason County developed its own projections and based its land allocations on those figures. Mason County concedes that it used "population projections that exceed the statutory range . . . ."

But Respondents contend that the OFM projections impose both a minimum and a maximum range for determining the size of UGAs. They argue that land allocated to urban growth must support no less than the low end number and no more than the high end number. Accordingly, because Mason County used a higher maximum than the OFM projection, the UGAs are too large. The Board agreed and found that Mason County's UGAs were oversized.

Respondents cite to several previous Board decisions that held that the OFM projections are a cap on urban growth and that a UGA must not be larger than needed to support the OFM maximum population projection. Other provisions of the GMA and its WACs support this interpretation as well. One of the goals of the GMA is to "[r]educe the inappropriate conversion of undeveloped land into sprawling, low-density development." RCW 36.70A.020(2). If a county could enlarge UGAs to accommodate any population maximum it chose, then the result would likely be the urban sprawl the GMA is trying to avoid. And, further, WAC 365-195-335(3)(e)(v), which addresses requirements

for setting UGAs, specifically states that the UGAs "should encompass a geographic area which *matches* the amount of land *necessary* to accommodate likely growth." (Emphasis added.) Accordingly, the OFM projection places a cap on the amount of land a county may allocate to UGAs.

■ Respondents also contend that Mason County's UGAs are oversized even for its own enlarged population projections. This is supported by the record. For example, the CP specifically states that the Belfair UGA "should be of sufficient size to accommodate growth which is 50% greater than projected." Although a county may enlarge a UGA to account for a "reasonable land market supply factor,"[3] it must also explain why this market factor is required and how it was reached.[4] Mason County did not explain why it needs space to accommodate growth 50 percent higher than projected by its already inflated estimates.

■ Further, the population projections used by Mason County and by the City of Shelton are different. The GMA requires that counties and their cities must coordinate when setting UGAs.[5] Accordingly, the Board was correct when it ordered Mason County and Shelton to reenter negotiations on the size and boundaries of the Shelton UGA.

Mason County used population projections that are too high and not authorized by the GMA. Thus, because the size of the UGAs depends on the population projection, the sizes determined by Mason County are, presumably, not in compliance with the terms of the GMA. Further, Mason County did not explain its reasons for enlarging the UGAs even beyond its own higher population projections. The

---

[3]*See* RCW 36.70A.110(2): "An urban growth area determination may include a reasonable land market supply factor . . . ."

[4]*See Bremerton v. Kitsap County*, Central Puget Sound GMHB No. 95-3-0039 (Nov. 6, 1995).

[5]*See* RCW 36.70A.100 ("The comprehensive plan of each county or city . . . shall be coordinated with, and consistent with, the comprehensive plans . . . of other counties or cities with which the county or city has, in part, common borders or related regional issues.").

Board's determination that Mason County's UGAs are inconsistent with the GMA is supported by the law and the facts in the record.

B. Rural Areas

■■■ The Board found that Mason County's rural activity center (RAC) designations are oversized and permitted growth that would eventually resemble urban growth. The Board determined that the CP and DRs do not comply with the rural growth requirements of the GMA.

The GMA forbids growth that is "urban in nature" outside of the areas designated as UGAs. RCW 36.70A-.110(2). Accordingly, "growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources, rural uses, rural development, and natural resource lands . . . ." is not allowed in areas designated as rural. RCW 36.70A.030(17).

The Legislature has amended the GMA to provide more specific rural area requirements. But the language in effect when Mason County created its CP and DRs required that the rural element include "lands that are not designated for urban growth, agriculture, forest, or mineral resources . . . . The rural element shall permit appropriate land uses that are compatible with the rural character of such lands . . . ." Former RCW 36.70A.070(5)(b) (1996). The GMA also includes the goal of reducing the "inappropriate conversion of undeveloped land into sprawling, low-density development." RCW 36.70A.020(2).

"Rural character" is, generally, characterized by open spaces, natural landscapes, "vegetation predominate over the built environment," and developments that "are compatible with the use of land by wildlife and for fish and wildlife habitat . . . ." RCW 36.70A.030(14)(a), (d). The GMA allows counties to use varying densities and cluster developments in rural areas, as long as the densities and clusters do not become urban and do not require the extension of urban services.

Mason County's CP and DRs provide density levels for each of its rural and urban growth areas. For example, the residential density levels for the Shelton UGA are between four du/ac and eight du/ac.[6] Allowable RAC residential densities are between two du/ac and eight du/ac. Both areas have the same nonresidential density levels. Thus, the Shelton UGA and the RACs allow essentially the same density level and allow the same maximum residential density level. The density levels established for the RACs therefore allow for high density growth that is "urban in nature," contrary to the requirements of the UGA.

 Respondents also argue that the density levels established for RACs and other rural areas are, by themselves, inadequate under the GMA. Respondents cite to several Board decisions that have specifically stated that 1-acre to 2.5-acre lot sizes are per se urban densities, and rural densities should average 10 to 80 acre lots.[7] Mason County's CP and DRs list the standard rural residential lot size as 5 acres, but they can be as small as 2.5 acres, a size the Board believes is urban. The RAC standard residential lot size is .5 acres, but allows lots as small as .125 acres. These densities would allow for urban-like development, not consistent with primarily agricultural uses.

Finally, the Board noted that only 585 acres are needed for RAC development, while the CP allots 5,102 acres for RAC development. It further noted that the high density levels allowed in that 5,102 acres would allow a population growth that far exceeds the projected growth, would fail to funnel growth into designated urban areas, and would constitute urban density in areas designated rural.

Alternatively, Mason County argues that many DRs and planning policies will prevent the type of urban growth that concerned the Board: Specifically, performance standards, density bonuses, restrictions on extension of urban services and so forth. However, as the Board found, these

---

[6]Du/ac stands for density units per acre.

[7]*See Bremerton*, GMHB No. 95-3-0039.

measures are phrased not as requirements or thresholds, but as considerations or suggestions. Because they are not requirements, urban type growth could still be allowed under these measures.

The rationale for Mason County's determinations is not evident in the record, and Mason County does not point to a place in the record where its justifications are explained. Urban growth is not allowed outside areas designated as UGAs. The Board's determination that the rural element of Mason County's CP is oversized and allows for urban growth in RACs is supported by the record.

C. Capital Facilities and Level of Service

The Board determined that Mason County's capital facilities element does not comply with the GMA and is inadequate due to the use of inaccurate population forecasts and the lack of specific future rural development plans. Mason County argues that (1) a level of service identification is required only for the transportation element of the CP, and (2) the GMA requires identification of existing capital facilities and capacities, but only an estimate of future needs.

First, WAC 365-195-315(2)(a) and (b) recommend selecting levels of service for the next 20 years for all capital facilities, including water systems, sewer systems, storm water facilities, schools, parks, recreational facilities, and police and fire protection facilities. As Respondents point out, Mason County's CP does not discuss future levels of service for these facilities. Second, the GMA specifically requires that the capital facilities element of the CP consists of both an inventory of existing facilities, and "the proposed locations and capacities of expanded or new capital facilities; . . . ." RCW 36.70A.070(3)(c). Accordingly, Mason County's arguments fail.

Further, as Respondents argue, the GMA also requires "at least a six-year plan that will finance such capital facilities within projected funding capacities and clearly identif[y] sources of public money for such purposes; . . . ." RCW 36.70A.070(3)(d). Mason County's CP and DRs do not do this. Accordingly, the Board's determination

that the CP and DRs do not meet the capital facilities requirement of the GMA is supported by the record.

D. Aquifer Recharge Protection

The Board found that the CP and DRs do not adequately address the issue of aquifer protection. The GMA states that a county "shall adopt development regulations that protect critical areas . . . ." RCW 36.70A.060(2). An aquifer recharge area is a "critical area." RCW 36.70A-.030(5)(b). Mason County argues that the Board failed to consider that it had taken steps to protect aquifers, including addressing hazardous waste and water quality and analyzing the possible effects of development.

However, the Board found that these steps, while "laudable," fail to adequately address how the County would protect the aquifers from possible hazards other than hazardous waste and sewage. For example, it does not address agricultural and household chemicals, animal waste, nor the effects of increased development and paved surfaces. The Board further found that the CP and DRs often state only that regulations and protections will be adopted in the future.

The GMA requires adoption of regulations to protect the aquifer. Mason County's policies and future plans are not sufficient to meet the requirements of the GMA.

E. Affordable Housing

The GMA requires a housing element that "makes adequate provisions for existing and projected needs of all economic segments of the community." RCW 36.70A-.070(2)(d). The Board found that the CP and DRs do not do so, stating: "We fail to see how a rural lands policy which encourages expansion of urban clusters to a magnitude beyond the needs of a 20-year population projection, thus virtually assuring the need for urban infrastructure and services, could be construed as a method of holding housing costs down countywide." Mason County argues that the CP and DRs adequately provide for low cost housing, but does not say how. Accordingly, it did not meet its

burden of showing that the Board's finding regarding the housing element is invalid.

F. Final Environmental Impact Statement

 The Board determined that Mason County's final environmental impact statement (FEIS) done in accordance with the CP should be reconsidered. It cited two letters provided by Respondents, one written by a former county planner and the other by a representative of the Department of Fish and Wildlife, both criticizing Mason County's FEIS. The Board ordered the County to "engage in a more through analysis of environmental impacts generated by the proposed reworking of the CP and DRs that would comply with the Act." Mason County argues that the FEIS is adequate.

However, the WACs require that an EIS be revised if the plan it analyzes is changed. *See* WAC 197-11-408(5) (An agency "shall revise the scope of an EIS if substantial changes are made later in the proposal . . . ."). Accordingly, if Mason County's CP and DRs must be substantially revised because of high population estimates and large UGAs and RACs, a revised EIS is necessary. The Board did not err in ordering this.

G. Open Spaces

 Finally, the Board also found that Mason County's CP and DRs do not comply with the GMA's open spaces provisions. The GMA requires counties to include "greenbelt and open space areas" in its UGA element. RCW 36.70A.110(2). It also requires counties to "identify open space corridors within and between urban growth areas." RCW 36.70A.160. Mason County's CP and DRs do not. The map showing the locations and sizes of the UGAs does not specify or even mention open space areas. The Board correctly found this element not in compliance with the GMA.

III. Scope of the Board's Authority

Mason County contends that the Board exceeded its

statutory authority under the GMA because it imposed requirements on the CP and DRs that do not exist in the GMA and because the Board substituted its own judgment for the County's instead of presuming the CP's and DRs' validity.

First, the GMA gives Growth Management Hearings Boards authority to find noncompliance with the GMA.

> In any petition under this chapter, the board, after full consideration of the petition, shall determine whether there is compliance with the requirements of this chapter. . . . The board shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and *in light of the goals and requirements of this chapter.*

RCW 36.70A.320(3) (emphasis added). The GMA clearly allows the Board to consider both the goals and the specific requirements of the GMA when considering a petition alleging noncompliance. *See also* former RCW 36.70A-.300(2)(a) (1995) (CP may be immediately invalid if Board finds continued validity would substantially interfere with the goals of the GMA). Administrative bodies like the Growth Management Hearings Boards may exercise powers conferred by statute, either expressly or by *necessary implication. See Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County,* 135 Wn.2d 542, 558, 958 P.2d 962 (1998). By necessary implication, the GMA allows the Board to exercise some independent judgment regarding whether a county's CP and DRs comply with the requirements of the GMA or substantially interfere with its goals.

Second, the Board primarily found that Mason County's CP and DRs do not comply with the specific requirements of the GMA. For example, not using the OFM population projections, not specifying the location of open spaces, permitting urban-type growth in rural areas and not specifying a six-year financing plan for capital facilities.

Finally, the Board specifically stated:

Mason County's Comprehensive Plan, and the development regulations implementing it . . . were presumed valid by this Board. The evidence brought forward by Petitioners [Respondents] in this case was weighty. It was clear from the evidence that Mason County had adopted a Plan and Ordinance which allowed for urban development in rural areas, failed to prevent sprawl, failed to maintain the rural nature of rural areas, allowed for non-resource based industry in rural areas and failed to properly size urban growth areas to accommodate population projections. By adoption of this ordinance, Mason County has erroneously applied or interpreted the Act, and in several areas, has substantially interfered with its goals. The presumption of validity, therefore, was overcome by the presentation by Petitioners [Respondents] of a preponderance of the evidence to the contrary.

The Board did presume the CP and DRs valid, but found that Respondents presented enough evidence to overcome that presumption. The GMA provides for such a determination, and the Board did not overstep its authority.[8]

### IV. Constitutional Challenges

#### A. Vagueness

Mason County contends that if the GMA is interpreted to allow the Board to exercise its independent judgment over the validity of a CP and DRs, it is unconstitutionally vague because it thereby allows for discretionary enforcement. We reject this argument.

First, the authority of the Board is limited to determining whether the CP and DRs violate the specific terms of the GMA or substantially interfere with its stated goals. The Board does not have authority to reject a CP and DRs for any reason whatsoever.

---

[8]Mason County also argues that the Board's order is substantively inadequate because it does not cite to the record or to applicable law. The order does refer to parts of Mason County's CP and DRs in its order and generally states why these portions are inadequate under the GMA. Thus, we reject this argument, but admonish the Board to include specific citations to the record and the GMA in order for review to orderly proceed.

Second, a statute is presumed constitutional, and the party challenging it has the burden of proving beyond a reasonable doubt that it is unconstitutionally vague. *See City of Seattle v. Abercrombie*, 85 Wn. App. 393, 400, 945 P.2d 1132, *review denied*, 133 Wn.2d 1005 (1997).

"[S]ome measure of vagueness is inherent in the use of language. Thus, impossible standards of specificity are not required. A statute is not unconstitutionally vague merely because a person cannot predict with complete certainty the exact point at which his actions would be classified as prohibited conduct." *Abercrombie*, 85 Wn. App. at 399-400 (citations omitted). Mason County does not point to any specific language in the GMA to support its argument that the GMA is unconstitutionally vague on its face. Thus, the County has not met its burden of proving vagueness beyond a reasonable doubt.

Further, "[a] party to whose conduct a statute clearly applies may not challenge it on the ground that it is vague as applied to the conduct of others." *Abercrombie*, 85 Wn. App. at 400 (citing *Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 740, 818 P.2d 1062 (1991)). If a party's conduct falls within conduct specifically proscribed by the statute, the party cannot challenge the statue as applied in other hypothetical situations. *See State v. Stark*, 66 Wn. App. 423, 832 P.2d 109 (1992). Here, the primary flaws found in the Mason County CP and DRs are elements specifically required or proscribed by the GMA. And, although the GMA is not clear as to the methods a county should use, it is specific about the required outcomes. If the CP and DRs will not meet those requirements, then it clearly does not comply with the GMA. Accordingly, as applied to Mason County under the facts of this case, the GMA is not unconstitutionally vague.

B. Separation of Powers

Mason County contends that the Board is part of the executive branch and therefore does not have the constitutional authority to invalidate a legislative act by a

local governmental body. First, Mason County cites no authority to support its assertion that the Board is a purely executive body. Rather, the Board is an administrative agency created by the Legislature. *See Skagit Surveyors*, 135 Wn.2d at 558. And it is well established that such agencies can constitutionally act in a quasi-judicial capacity. *See ASARCO Inc. v. Air Quality Coalition*, 92 Wn.2d 685, 696, 601 P.2d 501 (1979). The Legislature may delegate administrative powers to agencies to determine facts and interpret the laws it is charged with administering. *See Barry & Barry, Inc. v. Department of Motor Vehicles*, 81 Wn.2d 155, 159, 500 P.2d 540 (1972). Accordingly, the Board is not an executive body infringing on the powers of the local legislative branch and is not unconstitutionally exercising a quasi-judicial function by voiding County's legislative act. This delegation of authority does not violate the separation of powers doctrine.

Finally, the award of statutory attorneys fees was appropriately awarded by superior court under RCW 4.84.010.

Affirmed.

SEINFELD and ARMSTRONG, JJ., concur.