IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SPOKANE COUNTY, a political subdivision of the State of Washington, | ) ) ) | No. 32240-8-III |
| Appellant, | ) ) | |
| v. | ) ) ) | |
| EASTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, a statutory entity, NEIGHBORHOOD ALLIANCE OF SPOKANE COUNTY, FUTUREWISE, FIVE MILE PRAIRIE NEIGHBORHOOD ASSOCIATION, SOUTHGATE NEIGHBORHOOD COUNCIL, THE GLENROSE ASSOCIATION, PAUL KROPP, LARRY KUNZ, DAN HENDERSON, STATE OF WASHINGTON DEPARTMENT OF COMMERCE, and WASHINGTON STATE DEPARTMENT OF TRANSPORTATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) | |

LAWRENCE-BERREY, J. — The Washington State Growth Management Act

(GMA), chapter 36.70A RCW, requires counties to provide for early and continuous

public participation before a county or city votes on any change to a comprehensive plan

or development regulation. Here, Spokane County (County) adopted Resolution 13-0689, which expanded the County's urban growth area (UGA) boundary by 4,125 acres and, without notice to the public, increased the population growth projection from 113,541 to 121,112 to fit the expanded boundary.

The Neighborhood Alliance of Spokane County, Futurewise, the Five Mile Prairie Neighborhood Association, the Southgate Neighborhood Council, the Glenrose Association, Paul Kropp, Larry Kunz, Dan Henderson, the State of Washington Department of Commerce, and the Washington State Department of Transportation (collectively the Neighborhood Alliance) petitioned the Eastern Washington Growth Management Hearings Board (Board) for review of the resolution, alleging that the County failed to comply with the public participation requirements of the GMA in adopting the increased population growth projection.

The Board found that the County's adoption of the increased population projection represented a significant change in the comprehensive plan that required public review and comment. It remanded the resolution to the County for compliance with the GMA's public participation requirements. It also invalidated the resolution, finding its continued validity would substantially interfere with the fulfillment of GMA goals.

On direct appeal from the Board's order, the County argues that the Board erred by concluding that a change in the population growth projection is a change to an amendment to a comprehensive plan under RCW 36.70A.035(2)(a). The County also asserts that the Board's order is not supported by substantial evidence and is the product of unlawful procedure. We conclude that the County's failure to notify the public of its increased population projection violates the GMA's public participation requirement. We also hold that the continuing validity of the resolution substantially interferes with the goals of the GMA. Accordingly, we affirm.

## FACTS

In 2009, Spokane County adopted a population growth projection as the basis for planning regarding potential changes to its UGA. The Board of Commissioners for Spokane County adopted Resolution 09-0531, "IN THE MATTER OF ALLOCATION OF THE 20 YEAR POPULATION FORECAST FOR 2011 to 2031," which further provides "the Board hereby adopts for planning purposes regarding the review and revision if necessary of the urban growth area boundary the population projection and allocations for the 20 year period ending in 2031 as described herein and set forth in Attachment 'A.'" Administrative Record (AR) at 963, 965. Attachment A adopted a 2008 to 2031 total population projection of 612,226 for 2031, with a projection of urban

3

population growth of 114,919 persons between 2008 and 2031.

In the process of planning for the UGA expansion, the County prepared two environmental impact statements (EISs). In 2011, the County prepared a draft and final EIS examining four alternatives for UGA expansion. In 2012, the County prepared another draft and final EIS adding a fifth alternative to the analysis. Both of the EISs used a 2011 to 2031 UGA population growth projection of 113,541, consistent with the projection adopted in Resolution 09-0531. The number was a little lower than the 2008 to 2031 UGA population growth projection, apparently to adjust for the 2011 to 2031 shorter time horizon. Using this population growth projection, all five alternatives showed a population capacity surplus, meaning that there was no need to expand the UGA.

On July 18, 2013, the Spokane County Board of County Commissioners adopted Resolution 13-0689, which added 4,125 acres of land to Spokane County's UGA and increased the UGA population growth projection from 113,541 to 121,112. The County's unilateral increase of the population projection appears to have been a retrofit driven by the desire to increase the UGA. During the Board hearing, the Board asked how the County could change the population forecast after the comment period had been completed. The county attorney, David Hubert, responded:

Well, I don't think that the change itself is de minimis. I don't think that the difference in the numbers is de minimis or insignificant in any sense.

. . . .

The fact that the analysis was made based on the initial population projection, the County's answer is that that was always—it was always anticipated that those numbers would be the starting point. We would do our analysis. We would look at what that means, what that population projection would require in terms of a size of a UGA and capital facilities and so on and so forth as a starting point so that we would know that if we choose one of the alternatives, then there's going to be a difference and that we're going to then have to adjust the land quantity analysis. We're going to have to adjust the capital facilities plan and everything to accommodate the final UGA boundary that's actually adopted.

CP at 127-28.

A Board member then asked if the population projection was driven by "the desired size of the UGA as opposed to a [real] population projection," observing, "We're fitting the population projection into the desired UGA size; isn't that true?" CP at 128.

Mr. Hubert answered:

Well, we are fitting the population into the UGA boundary that's adopted. . . . [I]n developed areas that aren't yet in the UGA, those need to be considered for being put in the UGA, if possible, and so forth. And so I agree with you that, yes, we're saying that the UGA boundary is going to tell us what population projection we have to adopt, but it wasn't simply a desire kind of a decision. It was a complex decision that was made, we believe, under the requirements of the GMA.

CP at 128-29. During oral argument before this court, Mr. Hubert conceded that the County drew its desired urban growth area map and then increased the

5

population growth projection to 121,270 to fit the chosen area.[1]

The County published the last public notice inviting public comment on the proposed changes to the UGA on February 3, 2013. The notice stated that the County was considering "PROPOSED REVISIONS TO THE SPOKANE COUNTY URBAN GROWTH AREA BOUNDARY INCLUDING CONCURRENT COMPREHENSIVE PLAN MAP AND ZONING MAP AMENDMENTS." AR at 1041. It provided in part:

> The proposal examines the adequacy of the County's Urban Growth Area and its ability to provide for future growth. The action includes amendment to the Spokane County Comprehensive Plan and Zoning Code maps should modification of the UGA be deemed necessary. Five alternative land use scenarios are considered within the proposal. A final decision on the UGA update may include any combination of study areas from the different alternatives.

AR at 1041.

The notice indicated that the Spokane County Planning Commission and the Steering Committee of Elected Officials for Spokane County had made recommendations and that a topic of discussion at the meeting may include environmental documents that

---

[1] Although the record does not reflect this, the parties agree and, therefore, we clarify the following point: The increased population growth projection of 121,112 was within the range of population growth projected by the office of financial management (OFM). Nevertheless, in its 2009 resolution, the County chose 114,919, a number also within the OFM range, as its population growth projection. As explained earlier in this opinion, the 114,919 growth projection number was the basis for the 113,541 growth projection number used in the County's 2011 and 2012 EISs.

6

had been prepared with the proposal. The notice also referred to the 2011 and 2012 EISs. However, neither the notice nor the recommendations suggested that the County was considering any changes to the UGA population growth projection.

The Neighborhood Alliance parties filed two petitions for review alleging that the County had not complied with the public participation requirements of the GMA in adopting the expanded UGA. They also asserted that the resolution should be declared invalid because it substantially interfered with GMA goals. The State Department of Commerce and State Department of Transportation filed a supporting response arguing that "population numbers are a necessary precursor to decisions on designations of the UGA" and that the County's unilateral adjustment of these numbers violated the GMA. AR at 1096.

The Board granted the respondents' motion and remanded the resolution to the County to address the public participation flaws regarding the population projection of 121,112. The Board specifically found (1) the continued validity of the new population projection of 121,112, which had not been subjected to adequate public participation processes, would substantially interfere with the fulfillment of GMA goals; (2) there was a significant risk of vesting; and (3) the resolution was invalid in its entirety and required public participation. It concluded: "[b]ased on the importance of the public participation

requirements of the GMA, [and] the basic significance of the County['s] adopted population growth target, . . . the Board determines [that] Resolution No. 13-0689 would substantially interfere with the fulfillment of GMA Planning Goals 1, 2, 3, 11, and 12." AR at 1321.

The Board meticulously outlined its reasoning. Starting with the proposition that "[t]he [UGA] population projection is the key starting point for determining the amount of land that is needed and appropriate for future growth, not vice versa," the Board noted that "[t]he GMA requires the size of a UGA must be 'based upon' the OFM 20-year population growth projection and a County's UGA designation cannot exceed the amount of land necessary to accommodate the urban growth projected by OFM, plus a reasonable land market supply factor." AR at 1313 (citing RCW 36.70A.110). The Board noted that as population projections change, jurisdictions are required to adopt corresponding changes in their capital facilities, such as sewer systems, road/vehicle capacity, and school facilities. These considerations, according to the Board, "lead to the inevitable conclusion that the first step in adopting changes to the size of urban growth areas is the population projection." AR at 1315.

The Board elaborated as follows:

> In the matter now before the Board, rather than updating its projected population targets through a clear cut public update process, as it initially

8

had done, the County changed its population projection and allocations for its UGA at the conclusion, that is, within challenged Resolution No. 13-0689 itself. There is no evidence in the record the County considered a change in the population projection or allocations until after the comment and review period. In fact, there is no evidence in the record of the actually adopted population allocation of 121,112 at any date prior to the date of adoption of Resolution No. 13-0689.

AR at 1315.

The Board rejected the County's argument that it was a logical inference that some of the five alternatives under consideration would require an increase in the projected population growth, finding that it was an equally valid inference that the alternatives that resulted in excess urban population capacity would lead the County to reject the expansion of the UGA. The Board reasoned:

[A]s previously addressed, the County's Notice of Hearing fails to reference the possibility of a change in the population projection. Rather, that is left to possible inference. One could infer an upward adjustment would be required to justify adoption of one of the alternatives which would otherwise result in an excessive population capacity. In essence, that is the position of the County. On the other hand, one could also infer that the extensive EIS analysis, including population studies, would lead the decision makers to reject any expansion resulting in excess population capacity. For example, all of the four alternatives the County studied showed that they exceeded the County's 2009 population projection for 2031 by 4,259 to 17,803 people. Even the no-action alternative, without any change in the existing UGA boundaries, exceeded the County's population projection by 4,259 people. A logical conclusion from this might be that the previous UGA boundaries were adequate, without any enlargement, to accommodate the projected growth for the County's population.

9

The County's argument also ignores the fact that several years of consideration of the UGA update had been based on the population projection of 113,541. While the County may be correct that all of the alternative study areas included different UGA population targets which were shown to the public, it was not disclosed to the public that a change would be made in the original population projection. The Notice of Hearing makes no mention whatsoever of the possibility of a change in the population projection.

AR at 1316-17 (footnotes omitted).

The Board then addressed the County's argument that the County was exempt from the GMA's public participation requirement because all of the proposals had been subject to extensive environmental impact studies. The Board concluded the exception did not apply because the population projection of 121,112 was not within the range of alternatives considered in the environmental impact statements.

Based on its finding that the resolution violated the GMA, the Board invalidated the resolution in its entirety. In addition to finding that the increased population projection had not been subjected to adequate public participation processes, the Board also found that the resolution violated other goals of the acts, including the reduction of urban sprawl and providing for adequate planning for public services and facilities. The Board stated:

The currently approved Resolution 13-0689 can also affect Goal 1, which encourages growth in urban areas, and Goal 2, reducing sprawl and the inappropriate development of undeveloped land, because it allows for

10

vesting in the currently expanded urban growth areas before the Resolution can be reviewed and decided upon by the Growth Board. The County has held pre-application conferences for subdivisions on 87.5 acres of land in the urban growth area expansions and on the day the expansions were approved another application for a subdivision was filed for 33.5 acres. Even if the Petitioners prevail in their challenge to the County, it is likely that these and other applications for subdivisions will vest before this case is decided and remanded to the County. The importance of the proper sizing of urban areas is a key component of reducing sprawl and limiting the inappropriate conversion of undeveloped land.

AR at 1320-21 (footnote omitted).

This court granted the parties' joint petition for discretionary review.

## ANALYSIS

I.    *Administrative Procedure Act (APA) Review Standard*

Growth management hearings boards are charged with determining

whether a comprehensive plan or development regulation is compliant with the GMA.

RCW 36.70A.302. The Administrative Procedure Act (APA), chapter 34.05 RCW,

governs our review of the Board's order. *PT Air Watchers v. Dep't of Ecology*, 179

Wn.2d 919, 925, 319 P.3d 23 (2014). Our Supreme Court has set forth the standard of

review as follows:

> The Board is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance" unless it determines that a county action "is clearly erroneous in view of the entire record before the board and in light of the goals and requirements" of the

11

> GMA. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must have a "firm and definite conviction that a mistake has been committed."
>     The legislature intends for the Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. But while the Board must defer to the Lewis County's choices that are consistent with the GMA, the Board itself is entitled to deference in determining what the GMA requires. This court gives "substantial weight" to the Board's interpretation of the GMA.

*Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 497-98, 139 P.3d 1096 (2006).

While growth management hearings boards defer to local planning processes, such deference "is neither unlimited nor does it approximate a rubber stamp." *Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hearings Bd.*, 161 Wn.2d 415, 435 n.8, 166 P.3d 1198 (2007). A county's discretion is limited by the 13 planning objectives and statutory constraints of the GMA. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 561, 14 P.3d 133 (2000). One of these goals is to "encourage the involvement of citizens in the planning process and ensure coordination between communities and jurisdictions to reconcile conflicts." RCW 36.70A.020(11). Moreover, "when it comes to interpreting the GMA, the same deference to counties does not adhere, and we give substantial weight to a board's interpretation." *Kittitas County v. E. Wash. Growth Mgmt. Hearings Bd.*, 172 Wn.2d 144, 156, 256 P.3d 1193 (2011).

12

The party challenging the hearings board decision bears the burden of proving it is invalid. RCW 34.05.570(1)(a). RCW 34.05.570(3) sets out nine grounds for invalidating an administrative order. The County asserts three. First, it argues that the Board erroneously interpreted or applied the law under RCW 34.05.570(3)(d). The County also argues that the Board failed to follow prescribed procedure and that the order is not supported by substantial evidence under RCW 34.05.570(3)(c ) and (e).

"Our review is de novo under RCW 34.05.570(3)(b) through (d), determining whether the order contains a legal error." *Spokane County v. E. Wash. Growth Mgmt. Hearings Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013). The Board's interpretation of the GMA is not binding on the courts. *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 341, 189 P.3d 38 (2008).

A challenge to the evidence is a mixed question of law and fact. *City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 164 Wn.2d 768, 779-80, 193 P.3d 1077 (2008) (quoting *Lewis County*, 157 Wn.2d at 498). In reviewing that question, we determine the law independently and apply it to the facts found by the Board. *Id.* (quoting *Lewis County*, 157 Wn.2d at 498). We review challenged findings of fact for substantial evidence: i.e., evidence sufficient to persuade a fair-minded person of the finding's truth or correctness. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136

13

Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Callecod v. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)). "We view the evidence in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority." *Miotke v. Spokane County*, 181 Wn. App. 369, 376, 325 P.3d 434 (2014).

II.    *County GMA Compliance*

The County first assigns error to the Board's conclusion that the County violated the public participation requirements of the GMA in adopting an increased population growth prediction without notice to the public. Specifically, the County asserts that the Board erred in concluding that the population growth projection of 121,112 constituted a significant change in the proposed amendment to the comprehensive plan. It argues, "[t]he fatal error in the Neighborhood Alliance's and in the Growth Management Hearings Board's logic is that the alleged change in the population growth projection, that Neighborhood Alliance complains of, is not a change to any of the 5 proposed alternative amendments to the UGA boundary." Appellant's Br. at 11. The County argues that the increased population projection could be inferred from four of the five alternatives being considered by the County, all of which were fully disclosed to the public, fully evaluated in environmental impact statements, and subject to extensive public participation.

14

Neighborhood Alliance disputes the County's interpretation of the GMA, arguing that RCW 36.70A.035(2)(a) applies to any change to the amendment of a comprehensive plan. Noting that the change in the projected population growth resulted in a significant expansion of the UGA by 4,125 acres, Neighborhood Alliance argues that the change "had a significant effect of Spokane County's plan for the future and was done without any public involvement." Br. of Resp'ts at 18. It also disputes the County's argument that it was a logical inference that the alternatives being considered for the UGA boundary update would require an increase in the projected population growth, countering, "[r]ather than assume that the County might increase the population projection, a reasonable person would believe that the County would reject the proposed expansion of the UGA or even reduce the size of the UGA to make the capacity consistent with population growth projections." Br. of Resp'ts at 23.

The issue before us is a question of law: whether the County's adoption of Resolution 13-0689, which unilaterally increased the OFM's population growth prediction from 113,541 to 121,112, without notice to the public, constitutes a change to an amendment of a comprehensive plan under RCW 36.70A.035(2)(a), thus requiring public participation.

15

"'The primary goal in statutory interpretation is to ascertain and give effect to the intent of the legislature." *King County*, 142 Wn.2d at 555 (quoting *Nat'l Elec. Contractors Ass'n v. Riveland*, 138 Wn.2d 9, 19, 978 P.2d 481 (1999)). To discern the legislature's intent, we start with the plain language of the statute. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 238-39, 110 P.3d 1132 (2005) (quoting *King County*, 142 Wn.2d at 555). When the plain language is unambiguous, we construe the provision as written. *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 752, 888 P.2d 147 (1995) (quoting *Krystad v. Lau*, 65 Wn.2d 827, 844, 400 P.2d 72 (1965)). We evaluate the plain meaning of a statutory provision from the ordinary meaning of the language in the statute, as well as from the context of the statute in which that provision is found, and the statutory scheme as a whole. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003). We do not liberally construe statutory language in the GMA. *Thurston County*, 164 Wn.2d at 342 (quoting *Woods v. Kittitas County*, 162 Wn.2d 597, 612 n.8, 174 P.3d 25 (2007)).

A.   *Overview of the Growth Management Act*

The purpose of the GMA is to control urban sprawl by "[r]educ[ing] the inappropriate conversion of undeveloped land into sprawling, low-density development" and to ensure that "citizens, communities, local governments, and the private sector

cooperate and coordinate with one another in comprehensive land use planning."

RCW 36.70A.020(2); RCW 36.70A.010. "In a region like Washington State, where a

rich tapestry of distinct rural and urban communities has long provided for a wide range

of diverse lifestyles, maintaining the fundamental distinction between town and country is

widely viewed as an essential function of growth management law." Brent D. Lloyd,

*Accommodating Growth or Enabling Sprawl? The Role of Population Growth*

*Projections in Comprehensive Planning under the Washington State Growth*

*Management Act*, 36 GONZ. L. REV. 73, 76 (2001).

The GMA requires that counties prepare a detailed comprehensive growth

management plan which, among other things, designates UGAs. RCW 36.70A.070.

UGAs "are regions within which urban growth is encouraged and outside of which

growth can occur only if it is not urban in nature." *Miotke*, 181 Wn. App. at 377. The

comprehensive plan is the "coordinated land use policy statement of the governing body."

RCW 36.70A.030(4). Each plan must include "population densities, building intensities,

and estimates of future population growth." RCW 36.70A.070(1). "A comprehensive

plan shall be adopted and amended with public participation as provided in

RCW 36.70A.140." RCW 36.70A.070.

RCW 36.70A.140 provides:

Each county and city that is required or chooses to plan under RCW 36.70A.040 shall establish and broadly disseminate to the public a public participation program identifying procedures providing for early and continuous public participation in the development and amendment of comprehensive land use plans and development regulations implementing such plans. The procedures shall provide for broad dissemination of proposals and alternatives, opportunity for written comments, public meetings after effective notice, provision for open discussion, communication programs, information services, and consideration of and response to public comments.

Comprehensive plans must designate UGAs based on the OFM population growth predictions:

(1) Each county that is required or chooses to plan under RCW 36.70A.040 shall designate an urban growth area or areas within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature. Each city that is located in such a county shall be included within an urban growth area.

(2) *Based upon the growth management population projection made for the county by the office of financial management*, the county and each city within the county shall include areas and densities sufficient to permit the urban growth that is projected to occur in the county or city for the succeeding twenty-year period, except for those urban growth areas contained totally within a national historic reserve. As part of this planning process, each city within the county must include areas sufficient to accommodate the broad range of needs and uses that will accompany the projected urban growth including, as appropriate, medical, governmental, institutional, commercial, service, retail, and other nonresidential uses.

RCW 36.70A.110 (emphasis added).

18

Thus, population growth predictions are the foundation of effective long-term comprehensive planning. As just detailed, the legislature has entrusted the OFM to prepare countywide population growth projections and entrusted counties, in turn, to designate UGAs based on these projections.

B.    *RCW 36.70A.035: Public Participation under the GMA*

RCW 36.70A.035(2)(a) provides:

Except as otherwise provided in (b) of this subsection, if the legislative body for a county or city chooses to consider a change to an amendment to a comprehensive plan or development regulation, and the change is proposed after the opportunity for review and comment has passed under the county's or city's procedures, an opportunity for review and comment on the proposed change shall be provided before the local legislative body votes on the proposed change.

The County's interpretation of this requirement overlooks the central point that OFM projections of future population growth directly impact the designation of a UGA because the size of a UGA cannot be calculated without knowing what population a county is planning to accommodate within the expanded UGA. RCW 36.70A.110(2); *Thurston County*, 164 Wn.2d at 351. Thus, OFM population projections "cap . . . the amount of land a county may allocate to UGAs." *Diehl v. Mason County*, 94 Wn. App. 645, 654, 972 P.2d 543 (1999). One commentator has noted, "[p]opulation growth is a fundamental consideration in making long-range land use planning decisions . . . .

Indeed, all key planning decisions—including those involving public facilities and services, residential and commercial zoning, road and highway design, and landfill placement, to name only a few—are contingent on the number of people that must be accommodated during the planning cycle." Lloyd, *supra*, at 77.

In *Diehl*, Division Two of this court held that the GMA requires that counties use OFM population projections in determining UGAs. *Diehl*, 94 Wn. App. at 653-54. In that case, Mason County challenged the Western Washington Growth Management Hearings Board's decision that Mason County had violated the GMA by failing to use OFM population projections in designating UGAs. *Id.* Mason County defended its position by arguing that its use of independently-generated population projections was justified because the OFM projection was too low. *Id.* at 653. The court held that RCW 36.70A.110(2) precludes counties from using their own projections in lieu of the OFM's, reasoning, "[i]f a county could enlarge UGAs to accommodate any population maximum it chose, then the result would likely be the urban sprawl the GMA is trying to avoid." *Id.*

Given the foundational role of the OFM's population projection in determining the size of a UGA, the County's unilateral adoption of an increased population projection, which was used to justify a significant expansion of the UGA, constituted a significant

change, mandating public review and comment as provided in RCW 36.70A.035(2)(a).

While it is arguable, as the County contends, that an upward population adjustment could

be inferred to justify adoption of one of the alternatives that would otherwise result in an

excessive population capacity, it is an equally logical inference that the County would

reject expansion that would result in such excess population capacity. In fact, Spokane

County's land quantity analysis showed that the existing UGA had more land than needed

to accommodate the UGA population growth projection of 113,541. This analysis

documented:

> The County's population projection expects the addition of 113,541 people
> in the County's UGA between the years 2010 and 2031. The current UGA
> has the capacity to include 117,800 additional people. This result shows
> that the increase in population can be accommodated within the current
> UGA and that there is an additional excess of capacity equaling 4,259
> people.

AR at 437.

The resolution does not reflect why the County provided no notice that upward

population adjustment was being considered. The resolution's finding of fact 21 states

that the Board had previously adopted a resolution adopting a total population project of

612,226, which corresponds with the prior adopted population projection of an increase

of 113,541 people. Moreover, the OFM predicted slower population increases for

Spokane County in its 2012 update. While the resolution attempts to characterize the

113,541 figure as "preliminary," there is no evidence in the record that the County had considered a change in the population projection until after it expanded the UGA boundary and the period for comment and review had passed. By increasing the population forecast to fit the UGA boundary expansion desired by the County, the County effectively turned GMA planning procedures on their head, and deprived the public of its opportunity for review and comment.

Nevertheless, the County contends that the challenged notice of hearing complies with the "spirit" of the public participation guidelines under RCW 36.70A.140, which allows for some deviance from "exact compliance" with GMA procedures "if the spirit of the program and procedures is observed." To support its position, the County contends that the notice informed the public that the purpose of the hearing was to consider testimony related to the update of the County's UGA, directed the public to the related environmental documents, and identified the five alternative proposals. The County argues, "[i]t is difficult to imagine that after a process spanning 7 years of developing and publishing the 5 alternative proposed amendments to the UGA boundary that anyone did not have ample opportunity to review the proposed amendments and comment on them at some forum or before the Board of County Commissioners." Br. of Appellant at 16. The County also argues that because an environmental impact statement regarding all five

proposals had been prepared, the change in the resolution was exempt from the public review requirement under RCW 36.70A.035(2)(b).

RCW 36.70A.035(2)(b)(i) provides that an additional period for public review and comment is not required under the GMA if "[a]n environmental impact statement has been prepared under chapter 43.21C RCW for the pending resolution or ordinance and the proposed change is within the range of alternatives considered in the environmental statement." The County's argument overlooks the fact that the environmental impact statements did not include a range of population projections—only one was used: 113,541. Neither the EIS nor any other document in the record gave any indication that the County intended to change its population projection and allocations.

In its reply brief, the County argues that because the upward population projection could be inferred from the environmental impact statements, it did not need to include the 121,112 projection in the notice. It argues, "all five (5) of the alternatives from which the UGA boundary adopted by Spokane County was taken are clearly found within the [environmental impact statement] along with a clear indication of the projected population growth that would be accommodated within the boundary area." Reply Br. of Appellant at 10. Citing *Brinnon Group v. Jefferson County*, 159 Wn. App. 446, 245 P.3d 789 (2011), the County argues that the notice of hearing adequately informed the public

23

of the proposed change and that the exact population projection was not a necessary component of such notice.

*Brinnon* does not help the County. In that case, Jefferson County enacted an ordinance that amended its comprehensive plan to permit the development of a 256 acre master planned resort (MPR) near Brinnon, Washington. *Id.* at 454, 461. Brinnon Group challenged the ordinance for failure to comply with the public participation requirements of the GMA. The Western Washington Growth Management Hearings Board concluded the ordinance had complied with the GMA. Brinnon Group appealed, arguing that the ordinance included significant changes from the commission's recommendation and therefore the public should have been given the opportunity to comment on the changes. *Id.* at 466. The group specifically argued that the Board of County Commissioners violated the public participation requirement when it added a MPR boundary map that made "substantial changes" to the commission's recommended map. *Id.* at 472.

Division Two of this court rejected Brinnon Group's argument:

Although Brinnon Group exhaustively details the minor differences between these maps, these differences do not support Brinnon's Group's contention that the public lacked effective notice of the overall MPR proposal. As we detailed above, the [Board of County Commissioner's (BOCC's)] adopted boundary map is consistent with the maps that the public viewed in the draft EIS. Thus, the public had effective notice of the proposal that the BOCC adopted. Moreover, even assuming that the ordinance "changed" the proposed amendment, the County was

> not required to provide an additional comment period under
> RCW 36.70A.035(2)(b)(i) since the information in the draft EIS clearly
> reflected the BOCC's changes.

*Id.* at 476.

In contrast to *Brinnon*, the public here was not given accurate information in the environmental impact statements. Both the 2011 and 2012 EISs relied on the OFM's population growth estimate of 113,541 persons, not 121,112. This is not the sort of "minor" difference contemplated in *Brinnon. Id.* The County's adoption of the 121,112 figure provided the justification for expanding the UGA by 4,125 acres. By failing to inform the public of this increased population projection, the County's notice cannot be deemed to have complied with the "spirit" of the GMA.

Citizen participation is a core goal of the GMA. RCW 36.70A.020(11). Spokane County's own public participation guidelines provide that "Spokane County must take steps to involve the public in a meaningful manner." CP at 1016. Here, given that the County's planning process revealed that the existing UGA contained an urban population surplus in excess of projected growth, it would not have been unreasonable for a person to believe that the County would reject the proposed expansion or even reduce the size of the UGA. Such action would be consistent with our Supreme Court's directive that "a county's UGA designation cannot exceed the amount of land necessary to accommodate

25

the urban growth projected by OFM." *Thurston County*, 164 Wn.2d at 352. Here, not only has the public been excluded from a component of the decision making process, it has been excluded from the component that is the key to the justification of the entire proposal to expand the UGA. Thus, the Board correctly concluded that the County's adoption of the increased population projection in Resolution 13-0689 violated the GMA's public participation requirement.

### III.    *Invalidation of Resolution 13-0689*

The final question before us is whether the Board's decision to invalidate the resolution exceeded its authority. The County argues that the Board's authority regarding the dispositive motion on public participation was limited to determining whether the County complied with the notice and public participation goals of the GMA. It contends that "[n]othing in the GMA supports an argument that after a finding of noncompliance on any basis, the Growth Management Hearings Board is then free to consider any other basis for a determination of invalidity." Br. of Appellant at 22. It argues that none of the goals cited by the Board as a basis for its determination of invalidity pertain to public participation and therefore they cannot constitute a basis for invalidating the resolution. Finally, the County also asserts that the Board lacked jurisdiction to consider the possibility of vesting as a basis for invalidation of the ordinance.

26

RCW 36.70A.280 authorizes growth management hearings boards to hear challenges to whether state agencies or local governments are in compliance with the GMA. If the Board finds that a plan or regulation is not in compliance, it may enter a finding of noncompliance or a finding of invalidity. *Town of Woodway v. Snohomish County*, 180 Wn.2d 165, 175-76, 322 P.3d 1219 (2014). If the Board finds only noncompliance, the GMA directs the Board to remand the matter for compliance. RCW 36.70A.300(3)(b). The GMA also provides that "[u]nless the board makes a finding of invalidity under RCW 36.70A.302, a finding of noncompliance and an order of remand shall not affect the validity of comprehensive plans and development regulations during the period of remand." RCW 36.70A.300(4)(a).

The County's argument fails to recognize that invalidity is a remedy to address a finding of noncompliance. Any time the Board finds noncompliance, it may then proceed to determine whether a motion for a determination for invalidity should be granted under RCW 36.70A.302(1). RCW 36.70A.302(1)(b) provides that if the Board also determines that the "continued validity of part or parts of the plan or regulation would substantially interfere with the fulfillment of the goals of this chapter," the Board may invalidate the offending parts of the plan or regulation. "Upon a finding of invalidity, the underlying provision would be rendered void." *King County v. Cent. Puget Sound Growth Mgmt.*

27

*Hearings Bd.*, 138 Wn.2d 161, 181, 979 P.2d 374 (1999).

The legislature has authorized the Board to adopt procedural rules for "expeditious and summary disposition of appeals." RCW 36.70A.270(7). Under that authority the Board adopted WAC 242-03-560, allowing challenges to the "compliance with the notice and public participation requirements of the act." Contrary to the County's contentions, the Board followed proper procedure and did not base the determination of invalidity on findings of noncompliance beyond the scope of issues raised in the respondents' motion. Neighborhood Alliance asked for a determination of invalidity because the ongoing validity of the resolution would substantially interfere with certain GMA planning goals. In line with RCW 36.70A.302, the Board considered whether continued validity of the resolution would substantially interfere with the goals of the GMA.

We reject the County's assertion that none of the GMA's goals relate to public participation. Instead, we agree with the Board that failure to allow public participation on decisions about future population size will adversely impact "a whole host of planning functions, including planning for increased housing, commercial facilities, transportation, potable water, wastewater treatment, and other public infrastructure to serve the significantly increased population." AR at 1318.

Noncompliant expansion of a UGA undercuts the central goal of the GMA of

encouraging urban growth in areas with adequate public services and the goal of reducing urban sprawl. RCW 36.70A.020(1), (2). Here, in view of a UGA expansion of 4,125 acres, the Board correctly emphasized that "[t]he importance of the proper sizing of urban areas is a key component of reducing sprawl and limiting the inappropriate conversion of undeveloped land." AR at 1320-21. This is consistent with *Thurston County*, where our Supreme Court noted, "'[o]versized UGAs are perhaps the most egregious affront to the fundamental GMA policy against urban sprawl, and it is this policy that the UGA requirements, more than any other substantive GMA mandate, are intended to further.'" *Thurston County*, 164 Wn.2d at 351 n.3 (quoting Lloyd, *supra*, at 105).

Finally, contrary to the County's position, the Board properly considered the potential of vesting of development in invalidating the resolution. Neighborhood Alliance argues, "[v]esting of development permits in an improperly expanded UGA substantially interferes with the goals of the GMA to direct urban growth to urban areas and to reduce sprawl, so [it] is properly within the scope of the issues that the Board may consider when deciding whether to make a determination of invalidity." Br. of Resp'ts at 38. If a resolution were found noncompliant but allowed to remain valid, development proposals could vest within the expanded UGA while the resolution wallows on remand. The *Miotke* court addressed this problem, holding that a County cannot use the vested

29

rights doctrine to shield itself from its failures in the planning process:

> The vested rights doctrine and the provisions of the GMA are often intertwined, but nothing in our vested rights cases or in the language of the corresponding statutes indicates that the vesting of developers' rights somehow relieves a [c]ounty from its obligation to comply with planning goals under the GMA.

*Miotke*, 181 Wn. App. at 379.

Here, the record shows that project proponents attempted to vest in the expanded UGA before the Board issued its order. If the Board was to only find that the expansion of the UGA was noncompliant, that remedy would be futile if the County could allow development within the noncompliant UGA and then later argue that these areas must be included in future UGA expansions because they have been urbanized. We conclude that the Board followed proper procedures in invalidating the resolution.

Affirmed.

Lawrence-Berrey

WE CONCUR:

Siddoway, C.J.

Fearing, J.

30